UNITED STATES of America

v.

Robert H. CAMPBELL, Appellant.

UNITED STATES of America

v.

EXCAVATION CONSTRUCTION, INC., Appellant.

Nos. 81–1762, 81–1765.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1982.

Decided Aug. 3, 1982.

---

R. Kenneth Mundy, Washington, D. C., for Robert Campbell, appellant in No. 81–1762.

Jacob A. Stein, Washington, D. C., with whom Robert F. Muse, Washington, D. C., was on brief, for Excavation Const., Inc., appellant in No. 81–1765.

E. Anne McKinsey, Asst. U. S. Atty., Washington, D. C., with whom John A. Terry, John P. Hume, Carol E. Bruce, William J. Birney, Asst. U. S. Attys., and Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, were on brief, for the U. S., appellee in Nos. 81–1762 and 81–1765.

Before TAMM, MIKVA and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The two cases consolidated here involve appeals from practically every facet of a criminal trial in the district court.[1] In March 1981, after six weeks of trial and four days of deliberation, the jury found Excavation Construction, Inc. (ECI) guilty of giving an illegal gratuity in violation of 18 U.S.C. § 201(f). The jury also found Judge Robert Campbell guilty of receiving an illegal gratuity in violation of 18 U.S.C. § 201(g). The trial court denied the defendants' post-verdict motions for judgments of acquittal, and imposed sentence. Despite the range and importance of the questions raised by appellants, we affirm.

## I. BACKGROUND

ECI was formed to engage in trucking and construction work. In 1974, when the company obtained three contracts for construction of Metro subway stations, ECI maintained a fleet of 80–85 dumptrucks to conduct dirt-hauling operations. These trucks were subject to the vehicle weight restrictions of the District of Columbia. They could carry a maximum load of 44,000 pounds unless they displayed special use permits, costing $680 apiece, that raised the limit to 65,900 pounds.

ECI purchased 112 special use permits for the year ending June 1974. It purchased only 60 permits for the year ending June 1975, and no permits at all for the next two years. As a result, ECI received hundreds of traffic tickets charging weight violations. These tickets were handled erratically by the Superior Court.[2] A number of judges (including some who later testified for the defense) dismissed the tickets or imposed only token fines. One of these judges was Robert Campbell, who had been appointed to the Superior Court bench in 1972. In over 90 percent of the 1,138 tickets involving ECI that were considered by Judge Campbell, the judge suspended sentence.[3]

ECI's assistant general manager, Robert Jenkins, had responsibility for supervision of the ECI truck fleet. Jenkins was called before a grand jury in 1978, and at that time testified that he had never delivered anything of value to Judge Campbell. In July 1978, Jenkins discussed his testimony with another ECI employee, Walter "Junior" Jones, and Jones gave similar testimony at his own grand jury appearance. In August 1978, however, the *Washington Post* reported that ECI employees had assisted in the move of Judge Campbell's household furnishings under the direction of Jones and Jenkins. Jones was then offered immunity in exchange for testimony against Jenkins, and Jenkins was ultimately indicted and convicted of perjury. We affirmed that conviction in *United States v. Jenkins*, No. 79–2559 (D.C.Cir. Sept. 19, 1980).

In August 1980, the grand jury charged ECI and Judge Campbell in a four-count indictment, alleging conspiracies in viola-

1. On July 16, 1982, we vacated an earlier order consolidating these cases with *United States v. Larry Campbell*, No. 81–1757, an appeal taken by the government from an order of the trial court in this trial entering judgment of acquittal for a third defendant (not related to Judge Campbell) notwithstanding the jury's verdict.

2. A defense analysis of Superior Court dispositions of overweight tickets showed that Judge Campbell was not alone in imposing token fines or suspended sentences. Tr. 5326–30. On some occasions, the local government declined to prosecute these violations altogether. Tr. 4994–5020, 5252–54. The defense also suggested that the District of Columbia "was not speaking with one voice" on the desirability of weight laws. *See* Tr. 5000 (Corporation Counsel's staff suspected police were not enforcing weight laws fairly); Tr. 4592–93 (judge testified that he always suspended sentence because the laws were unevenly enforced and because their purpose was unclear). A witness from the Department of Transportation produced records suggesting that most of the large trucking companies in the District of Columbia had stopped buying the special use permits or had sharply reduced their purchases by 1975. Tr. 269–87.

3. Tr. 3262–3343. The government's evidence also showed that ECI frequently arranged to have its tickets brought before Judge Campbell and that on at least one occasion Judge Campbell reviewed and dismissed a bloc of 95 ECI tickets even though he was not assigned to traffic court that day. Tr. 3317–18, 4042. The evidence also suggested that Judge Campbell had been in serious financial trouble for many years. Tr. 2572–2602, 3069–89.

tion of 18 U.S.C. § 1962(d) (RICO) and 18 U.S.C. § 371, and the giving and receiving of bribes in violation of 18 U.S.C. § 201(b) and (c). The indictment charged 16 separate instances of bribery. Twelve of these were payments of cash, starting as early as 1966 when Campbell was an Assistant Corporation Counsel. The other four instances were gifts to Judge Campbell of three loads of topsoil, a garden cultivator, several cases of liquor, and the move of his household belongings.

Problems beset the prosecution almost immediately; even after a superseding indictment was filed, the government acted repeatedly to narrow the charges.[4] By the time the case went to the jury, the bribery scheme alleged in Count III of the indictment was confined to the move of household goods in August 1975 and five payments of cash between January 1976 and February 1977. At the conclusion of testimony, however, the trial court also agreed to instruct the jury of the lesser included offenses of giving and receiving an illegal gratuity in the third and fourth counts of the indictment.[5]

The jury found the defendants not guilty of conspiracy on Counts I and II. By way of a special verdict form, the jury also acquitted the defendants of bribery and found that there was no illegal gratuity given or received in connection with any of the five cash payments alleged. The jury did find each defendant guilty in connection

with the 1975 move of the household goods—ECI for having given an illegal gratuity in the form of that move, and Judge Campbell for having received that gratuity. In June 1981, the trial court fined ECI $10,000, the maximum penalty authorized under the statute, and sentenced Judge Campbell to serve a term of imprisonment of three months to two years.

## II. Issues Raised on Appeal

The defendants challenge the sufficiency of the evidence to support their convictions, the admission of hearsay evidence, the trial court's instructions to the jury, the alleged misconduct of the jury in reaching a verdict, and the sentencing decision of the trial court. We discuss each of these arguments separately.

### A. Sufficiency of the Evidence

The standards for evaluating the sufficiency of the evidence supporting a guilty conviction are well established. We must view the evidence in the light most favorable to the government and draw all justifiable factual inferences from it. The verdict will be overturned only if a reasonable jury could not accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *See, e.g., United States v. Staten,* 581 F.2d 878, 882 (D.C.Cir.1978); *Curley v. United States,* 160 F.2d 229 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

---

**4.** The superseding indictment, which was returned in September 1980, amended the third count by deleting a year from the alleged duration of the bribery scheme and by withdrawing the allegations as to the cases of liquor. In a bill of particulars filed in November 1980, the government abandoned the charges as to the topsoil and garden cultivator, and listed only nine instances of cash payments. After the jury had been selected, the government discovered documents questioning whether three of these payments could have gone to Judge Campbell, and withdrew these allegations. The trial court denied the prosecution's request that the withdrawal of these charges be kept from the jury, Tr. 76, observing that the government had been "negligent" at best in meeting its "responsibility to return indictments which accurately charge people with offenses." Tr. 59. Midway through the government's case, when uncontroverted evidence showed that yet an-

other alleged payment could not have been made to Judge Campbell, the trial court with the prosecution's acquiescence dismissed that count as well. Tr. 1837.

**5.** The trial court was first apprised that the government would submit proposed instructions on the lesser included offense on March 10, 1982, after the close of testimony. Counsel for the defendants agreed that the instructions were warranted for Counts III and IV, but contended that the jury could not use gratuities rather than bribes as the basis for a conviction of conspiracy under Counts I and II. The trial court adopted the defense position on March 12. Tr. 6205. During this same discussion, counsel for Judge Campbell stated that he had studied the proposed instructions overnight and had no objection to them. Tr. 6199–200.

Judge Campbell's defense sought to negate the existence of criminal intent. It emphasized that Judge Campbell gave $60 to the three ECI employees who assisted during the five-hour move, and that Judge Campbell sought to pay their supervisor, Jones, as well. When Jones refused to take any money for his own time or to let Judge Campbell pay for a truck that Jones had already rented, Judge Campbell "was confronted, not of his own volition or choice, with a gratuity . . . of such a nature that he could not give it back." Brief for Appellant Campbell at 12.

Although this version of events could be believed, there was clearly sufficient evidence from which the jury could conclude beyond a reasonable doubt that it was not so. There was credible evidence to suggest that Jenkins arranged the move pursuant to a meeting with Judge Campbell, that the $60 was intended as a tip rather than as payment for the value of the services given, and that Judge Campbell knew the movers' assistance was a gratuity rendered for or because of his official acts.[6] It was for the jury to resolve the question of Judge Campbell's intent based on this evidence, and we find no occasion to disturb its verdict.

## B. *Evidentiary Issues*

■ Jenkins was the government's principal witness at the trial. He had been convicted of three counts of making a false declaration before a grand jury in November 1979, and sentenced the following month to three years probation and a fine of $5,000. Jenkins was then given immunity from further prosecution other than for perjury, and was ordered to testify before the grand jury. In conversations with government prosecutors in February and April, 1980, Jenkins stated that he made numerous cash payments to Judge Campbell between 1973 and 1977. He also discussed other favors that had been given to the judge, including assistance during the household move.

During the trial a year later, however, Jenkins testified that he no longer remembered certain details of these transactions. He was not formally declared a hostile witness, but the trial judge characterized Jenkins as a "reluctant" witness from whom "the prosecutor literally has to pull every statement," Tr. 1020–21, "one of the most uncooperative witnesses I have ever seen," Tr. 1137, and a "stone wall." Tr. 1102. In particular, Jenkins testified that his first payment to Judge Campbell occurred after Campbell became a judge, but stated that he could not recall the year in which payment was made. In an effort to refresh Jenkin's memory, he was shown notes made by a prosecutor during an interview in February 1980. Jenkins' recollection was not refreshed, however, and the prosecution then sought to introduce the substance of the notes as Jenkins' past recollection recorded. Defense objections were overruled, and appellants now urge that this evidence was inadmissible as hearsay.

Although the use of prior statements of witnesses as substantive evidence raises one of the thornier issues in the law of evidence,[7] we cannot say that any error here

---

6. *See* note 3 *supra*. ECI, through Jenkins, had paid $48 to rent the truck used during the move, and paid Jones and the three other employees their regular salaries for the day. A prosecution witness who operated a moving service in the evenings after his employment as a D.C. policeman estimated the value of the move at between $136 and $300, based on the exteriors of the houses involved. Finally, although Jenkins could not remember whether Judge Campbell had asked him for help during the move, Tr. 1501, Jenkins testified that the subject came up while Jenkins was at Judge Campbell's house, Tr. 934, and that it was not unusual for Judge Campbell to telephone when

he needed cash or other services. Tr. 1055–63, 1064–71, 1081–83.

7. If a witness testifies that he no longer remembers the facts but does remember making a statement about those facts, the defense is deprived of effective cross-examination if such an out-of-court statement is offered to prove the truth of the matter asserted therein. Accordingly, the use of such statements are tightly circumscribed by the Federal Rules of Evidence. Rule 801(d)(1) provides that an out-of-court statement of the witness is not hearsay (and therefore is admissible) only if it was inconsistent with the witness's present testimony and if it was made at an earlier proceeding

was prejudicial. Jenkins testified at trial from his present recollection concerning roughly a dozen cash payments to Judge Campbell and the provision of other favors, and the defense was not deprived of effective cross-examination as to these events. Jenkins was on the stand for six days of the trial, and any erroneous ruling as to the admissibility of evidence concerning the exact year these payments began could hardly have been prejudicial.[8] *See Lutwak v. United States*, 344 U.S. 604, 619–20, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953).

■ Appellants also object to the government's introduction of evidence concerning the conversation between Jenkins and Jones that took place after Jenkins' first grand jury appearance. Although it is well settled that statements made by co-conspirators after the termination of the conspiracy generally may not be admitted against co-conspirators who were not privy to those conversations as substantive evidence of their association with the conspiracy, *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), appellants' objection misapprehends the only purpose for which this evidence was introduced.[9] We must also note that the defendants

made no objection at trial to the questions put to Jenkins and Jones about their meeting, and that any evidentiary error here could hardly be considered plain. *See United States v. McCray*, 433 F.2d 1173, 1175 n.1 (D.C.Cir.1970).

### C. Jury Instructions

The district court instructed the jury that the offense of giving a bribe charged in Count III of the indictment "necessarily includes the lesser offense of giving an illegal gratuity." The court then stated five elements of that offense, of which the final two were "that the defendant gave the money for or because of an official act," and "that the defendant acted knowingly and willfully." Tr. 6287–88. The elements of the offense of *receiving* an illegal gratuity were substantially the same, including that the defendant "received the money for or because of an official act performed or to be performed by him," and that the defendant acted "knowingly and willfully." Tr. 6293.[10]

Appellants urge that these instructions were erroneous on two grounds. First, relying on *United States v. Brewster*, 506

---

under oath and subject to a penalty for perjury. Jenkin's comments during his interview with the prosecutors did not meet several of these requirements. *See California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970). Rule 803(5) allows admission of such statements as past recollection recorded only if the writing was made or approved while "fresh" in a witness's memory. The notes were made in 1980 about events that Jenkins said occurred between 1973 and 1977.

8. The appellants cite two other instances of allegedly improper interrogation of Jenkins from prosecution notes of earlier interviews. In one, Jenkins was simply asked to explain how he had selected certain ECI check request forms that he identified to prosecutors as corresponding to cash payments he made to Judge Campbell. Tr. 1105–06. He testified about making those payments from his present recollection, however. The second instance was intended by the prosecution to highlight omissions in Jenkins' initial interview with the prosecutors that Jenkins filled in a week later, thus allegedly demonstrating the connection of a third ECI employee to the scheme. Tr. 929–45; *see* Brief for Appellee United States (Govern-

ment Brief) at 44. This examination did not relate to Judge Campbell or ECI.

9. Nothing in Jenkins' conversation with Jones implicated Judge Campbell. The government contends that it was "in the unenviable position of sponsoring the compelled testimony of two persons who had previously lied under oath," Government Brief at 51, and that this was a permissible attempt to anticipate and blunt defense efforts at impeachment. *See United States v. Halbert*, 640 F.2d 1000, 1004–05 (9th Cir. 1981); *United States v. Edwards*, 631 F.2d 1049, 1051–52 (2d Cir. 1980). Counsel for Judge Campbell cross-examined both Jenkins and Jones about their meeting and subsequent perjury, establishing that neither defendant had instructed them to lie to the grand jury. Tr. 1179–81, 1534–35, 3784–85.

10. The first three elements of these offenses required the jury to find (a) that the defendants gave (or received) money or the move; (b) that Robert Campbell was a public official at the time; and (c) that the defendants acted "otherwise than as provided by law in the proper discharge of official acts." Tr. 6286–92.

F.2d 62 (D.C.Cir.1974), they contend that it is not enough to support a gratuity conviction that a defendant acted "knowingly and willfully." Instead, they suggest that the defendant must have specific knowledge of a definite official action for which the gratuity is given, knowledge that they argue has not been shown in this case. Second, appellants observe that in some situations the giving of a gratuity is *not* necessarily included in the greater offense of bribery. *See United States v. Brewster,* 506 F.2d at 68. They urge that the verdict be overturned because the jury was not instructed of relevant differences between bribery and illegal gratuities, and thus may have convicted the defendants for an offense that was not charged in the indictment.

■ As noted above, however, *see* note 4 *supra,* appellants failed to object to the proposed gratuity instructions at trial. Fed.R.Crim.P. 30 states:

No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

This language is not merely precatory. The rule requires that alleged errors in jury instructions be brought to the attention of the trial judge in order to provide an opportunity for their immediate correction; belated complaints are strongly disfavored. *See, e.g., United States v. Wiggins,* 530 F.2d 1018, 1020 (D.C.Cir.1976); *Moore v. United States,* 262 F.2d 216, 218 (D.C.Cir.1958), *cert. denied,* 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959). We therefore consider only whether the jury instructions were

plainly erroneous within the meaning of Fed.R.Crim.P. 52(b). We discuss appellants' claims in reverse order.

1. *Notice*

■■ It is true that an illegal gratuity need not always be a lesser included offense of bribery. As we explained in *Brewster:*

The bribery section makes necessary an explicit *quid pro quo* which need not exist if only an illegal gratuity is involved; the briber is the mover or producer of the official act, but the official act for which the gratuity is given might have been done without the gratuity, although the gratuity was produced because of the official act.

506 F.2d at 72. One obvious resulting distinction is temporal. "The gratuity section . . ., unlike the bribery section . . ., applies to past official acts as well as future ones." *Id.* at 68. Payments to a public official for acts that would have been performed in any event—whether before or after those acts have occurred—are probably illegal gratuities rather than bribes.[11] This does not mean, however, that all bribes must inevitably be paid prior to the official act in question. The statute proscribes offers and promises of bribes as well as the giving of bribes, and it is only logical that in certain situations the bribe will not actually be conveyed until the act is done.[12]

The appellants' argument is highly conjectural: the indictment alleged only bribery, which contemplates *future* action; the trial court did not differentiate between gratuities given for past or future actions; ECI had received favorable treatment from Robert Campbell *prior* to the move of household goods in August 1975;[13] the jury

11. The word "probably" reflects the controlling nature of the defendant's intent, and the fact that the donor's intent may differ from the donee's. *See United States v. Anderson,* 509 F.2d 312, 332 (D.C.Cir.1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975) ("Thus the donor may be convicted of giving a bribe despite the fact that the recipient had no intention of altering his official activities, or even lacked the power to do so.").

12. Should the donor pay part of the bribe before and the rest of the bribe after the official

act, however, each payment may be the basis of a separate count in the indictment and subject to sentences that run consecutively and cumulatively. *E.g., United States v. Anderson,* 509 F.2d at 332–33 (rejecting claim that each payment was an "installment of the same transaction").

13. The cash payments to Robert Campbell allegedly began as early as October 1966, when he was an Assistant Corporation Counsel with the District of Columbia and was said to be

may have wrongfully convicted the defendants because of a gratuity for past official acts; and the defendants may therefore have been convicted of offenses that were not charged in the indictment, and on which they did not have notice.

■ The argument fails. A bribe may be conveyed after the official act has been performed, and thus the fact that the indictment charged that the first payment was made to Judge Campbell in 1973 does not immunize defendants' actions prior to that date. The defendants had notice that they were on trial for an on-going scheme that covered an extensive period of time, and in fact the case for the defense did not limit itself to events later than 1973.[14] As a result, the possible distinction between bribery and illegal gratuities apparently did not strike defense counsel as anything significant at the time the instructions were requested. In the context of the trial as a whole, it was not plain error for the trial court to share this view.

## 2. Intent

It is no easy task to articulate the requisite intent necessary to constitute accepting or giving an illegal gratuity. The statute requires that a bribe be given or received "corruptly," whereas the intent required by the gratuity section of the statute is expressed by the language "otherwise than as provided by law for the proper discharge of official duty." See Brewster, 506 F.2d at 76. In Brewster, we remanded for a new trial because the jury instructions did not define the distinction between these requisite intents "with indisputable clarity." Id. at 67. Based on that case, appellants here urge that the trial court erred in not requiring the jury to find that the gratuity was conferred with "specific knowledge" of "a definite official action for which compensation was intended." They make the somewhat startling claim that "if Robert Jenkins provided a move of household belongings to Judge Robert Campbell because he felt that Judge Campbell had been (or would be) generally lenient with respect to [ECI] overweight citations, this would not be sufficient for culpable intent." Brief for Appellant ECI at 17–18 (emphasis added).

Appellants' argument reveals a fundamental misconception of the gratuity statute and an overreading of Brewster, which concerned the conviction of a former United States Senator who had received a substantial sum of money from a mail-order company that had an interest in defeating enactment of pending legislation to increase postal rates. The hard question in Brewster involved distinguishing illegal gratuities from innocent campaign contributions, and the court concluded that the trial judge had not made the distinction intelligible to the jury:[15]

> [S]ince "willfully and knowingly" could mean that defendant Brewster knew when he accepted the money that he was receiving the contribution because of his record of performance in this field of postal legislation, and that if he continued such legislative actions in the future (particularly the near future) he would likely receive further contributions, how does this instruction distinguish the contribution found to be illegal here from a perfectly legitimate contribution? No

---

sympathetic to trucking interests. Tr. 894; see note 2 supra.

14. See, e.g., Tr. 4223–28 (cross-examination of Jerry Wayne Gray, a former ECI employee who claimed to have given cash to Robert Campbell in 1966). The indictment alleged as overt acts of Judge Campbell in connection with the conspiracy counts only official judicial acts between 1975 and 1977, and the jury was instructed that the substantive bribery counts (within which the gratuity offenses were "necessarily included") charged acts during the same period. It is not even clear which "acts"

of Robert Campbell could have been the basis for ECI gratuities prior to 1973, because "sympathy to trucking interests" does not constitute an official act.

15. The gratuity instruction in Brewster merely required the jury to find that the defendant acted "willfully and knowingly rather than by mistake or accident. There need not be proof, however, that there was any corrupt intent on the part of defendant Brewster to be influenced in the performance of an official act." 506 F.2d at 80.

politician who knows the identity and business interests of his campaign contributors is ever completely devoid of knowledge as to the inspiration behind the donation. There must be more specific knowledge of a definite official act for which the contributor intends to compensate before an official's action crosses the line between guilt and innocence.

506 F.2d at 81.

■ We must therefore conclude that appellants have taken *Brewster* entirely out of context in suggesting that it was insufficient for ECI merely to seek or reward "lenient treatment" from Judge Campbell. However difficult it may appear for juries to distinguish illegal gratuities from legitimate campaign contributions to elected officials, no similar problems attend deciding whether a judge has accepted gifts "with knowledge that the donor was paying him compensation for an official act." *United States v. Brewster*, 408 U.S. 501, 527, 92 S.Ct. 2531, 2545, 33 L.Ed.2d 507 (1972).[16] It was more than sufficient in this case for the trial court to require that the alleged gratuities be given and received "knowingly and willingly," and "for or because of an official act." In the context of the trial, and in light of the failure of defense counsel to seek a more specific instruction, we have no doubt that the jury had a clear understanding of the distinctions among bribery, illegal gratuities, and innocence. This was everything that *Brewster* requires.[17]

### D. *Jury Misconduct*

Following the return of the jury's verdict, one of the jurors contacted the trial court's chambers and asked to speak with him concerning her jury service. A transcript of their meeting was subsequently made available to all counsel; pertinent portions are set out in the margin.[18] The parties draw

---

**16.** In a lengthy footnote, *Brewster* reviewed several gratuity precedents and implied that the requisite intent must be more clearly shown when the case involves a campaign contribution to "an elected public official" than "when the recipient is an Internal Revenue agent or other appointed official." 506 F.2d at 73 n.26; *see id.* at 77 n.40 ("whether a statute provides fair warning of the conduct it seeks to prohibit depends in part on the persons to whom and the setting in which the statute is applicable"). The discussion reflects the thin but necessary line that must be drawn between campaign contributions and improper gratuities.

**17.** Judge Campbell, in a two-sentence argument, suggests that the gratuity statute is unconstitutionally vague and overbroad if it can be construed to cover his conduct discussed here. Brief for Appellant Campbell at 11. The gratuity sections of the statute have withstood constitutional challenges in a variety of contexts, *e.g., United States v. Brewster*, 506 F.2d at 76–78; *United States v. Alessio*, 528 F.2d 1079, 1083 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976). We find the constitutional argument without merit.

**18.** The juror began by explaining that after the first three days of deliberation, "[t]he jurors were very unhappy about being sequestered and they were voting so that they could go home to their husbands and wives and families .... Everyone's nerves were shot." Tr. 2–3. She then criticized the way the jurors discussed parts of the evidence, and the trial court began to ask questions.

The court: Well, did there come a time when you felt that the judge and the other defendants were either guilty or not guilty on all counts?

Juror: On the move. That's what I told them, that I could buy into that. There was a whole lot of gray, but I told them that I could buy into that, for a unanimous vote.... But I did it on a roundabout way. I asked them—because I was still voting not guilty—

The court: On all counts.

Juror: On the most specific. That was the last thing that we were dealing with—because I wasn't positive that they were guilty. And so I told them if we could take a consensus and everybody votes yes, that they would take a consensus—you found one guilty, you could find all guilty by a second guilty or not guilty vote. So we got a unanimous yes on the consensus, which meant that whichever way they went, my vote had to go that way if I was in the minority. And I explained this to them several times. And that's how they came up with the verdict—that's when they did because I did this. I lost it....

The court: Now you have some reservations about whether your vote was a proper vote; is that your—?

Juror: No, I don't have any reservations about it. I gave that to them and that's the way it came out. And in this society I can easily accept it. But it was just that—the way I did it....

The court: So what specifically is your present complaint? Did you just want to talk to me?

different conclusions from these remarks. The government views the "major concern" of this juror as whether "her intransigence had swayed other jurors, who apparently had initially voted to convict on some or all of the counts, to abandon their convictions and yield to her." Government Brief at 98 n.48. The defendants conclude that the jury's verdict was not unanimous, because this juror voted contrary to her own beliefs in order to facilitate a unanimous verdict. They urge that the verdict be set aside, or at least that the case be remanded for specific inquiry with counsel present pursuant to District Court Local Rule 1–28(c).

 Only in extraordinary circumstances do courts inquire into the deliberative process of juries, and this is not such a case. Ordinarily, a verdict will not be upset on the basis of a juror's post-trial report of what occurred in the course of deliberations. *See, e.g., McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); Fed.R.Evid. 606(b); *cf. Jorgensen v. York Ice Machinery Corp.,* 160 F.2d 432 (2d Cir. 1947). The single exception concerns "extraneous influences" that may have improperly influenced the verdict.

"Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

*United States v. Wilson,* 534 F.2d 375, 378–79 (D.C.Cir.1976) (quoting *Government of the Virgin Islands v. Gereau,* 523 F.2d 140, 149–50 (3d Cir. 1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976)). When confronted with allegations of irregularity in the jury's proceedings, the trial judge has broad discretion "to determine what manner of hearing, if any, is warranted." *United States v. Wilson,* 534 F.2d at 379; *see United States v. Parker,* 549 F.2d 998, 1000 (5th Cir. 1977).

The reasons for the distinction between "extraneous" and "intra-jury" influences on the verdict are self-evident. Outside pressures may distort the jury's deliberation to the point that its verdict results in injustice. In contrast, the give-and-take within this microcosm of the community leads to a verdict that is often the only way our legal system can define what it means by "justice." Inevitably, compromise verdicts and verdicts rendered out of compassion may result. *See, e.g., Standefer v. United States,* 447 U.S. 10, 22, 100 S.Ct. 1999, 2007, 64 L.Ed.2d 689 (1980); *Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932). But these are not unacceptable, and the jury system itself

> Juror: I just wanted to let you know that I had this uneasiness about—I felt that I had swayed eleven people maybe in the wrong direction because they should have been able to deliberate more and more and more, and come up with—but they didn't seem to want to do that. They wanted to go home.
> The court: You suggested there be a consensus taken.
> Juror: Yes.
> The court: If the consensus would be guilty or not guilty, you would go along with it.
> Juror: I did. The vote was going eleven to one, and I was the one.
> The court: You were the one holding out for not guilty.

> Juror: Yes.
> The court: Well, that's the way the jury system works.
> Juror: It's shocking.
> The court: It's the best system that's been devised yet. And based on what you have told me, there was nothing improper in the way the verdict was returned.

Tr. 2–10. We agree with the trial court that the jury's performance of its functions was not unlawful. The group dynamics of a jury at work may not be a model for high school civics books, but the jury remains the best system yet devised for deciding disputed issues of fact in our system of law.

would be undermined if losing parties could so easily destroy the finality of the verdict. We have no doubt that the jury misconduct alleged in this case concerned only the discussion among the jurors and the way the jurors elected to make their decision. The trial court correctly determined that no further inquiry was required and the judge did not abuse his discretion in responding to these allegations as he did.

### E. Sentencing

The trial judge was explicit in stating his reasons for imposing the sentences.

This is not a simple case of a judge merely receiving help from a friend in moving household furnishings from one location to another. The evidence that the court heard revealed that this was just one incident in a pattern of corruption which had been going on for a number of years. Now, although the jury has acquitted the defendant on the other counts of the indictment, nevertheless in imposing sentence I may properly refer to the evidence introduced with respect to crimes of which the defendant was acquitted, and for the record I rely principally on the case of *United States v. Sweig* [454 F.2d 181] in making that statement.... In this case, there is evidence that ECI received favorable treatment in court from the defendant in the handling of overweight tickets in return for gifts. It was unrefuted evidence on one occasion, for instance, that defendant received over nine hundred dollars worth of free liquor from Jenkins. After considering the evidence in this case during this lengthy trial, I'm convinced that Jenkins lied during some of his testimony in order to

protect this defendant. And that the defendant was very fortunate to escape conviction on some of the more serious charges.

Sent. Tr. 37, 39. Appellants contend that the trial judge hereby failed to give proper effect to the jury's acquittals, and thus offended the constitutional guarantees against double jeopardy, deprivation of due process, and deprivation of trial by jury.

■ This is the first occasion for this court to consider the interplay between a jury's fact-finding function and the judge's sentencing discretion, although the problem has arisen in other circuits.[19] We find the issue difficult because two fundamental propositions are at war. On one hand, it is a "fundamental sentencing principle" that " 'a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " *United States v. Grayson*, 438 U.S. 41, 50, 98 S.Ct. 2610, 2615, 57 L.Ed.2d 582 (1978) (quoting *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)). *See* 18 U.S.C. § 3577 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Courts have held that a sentencing judge may consider evidence of crimes for which a defendant has been indicted but neither tried nor convicted, *e.g., United States v. Bowdach*, 561 F.2d 1160, 1175 (5th Cir. 1977); evidence of counts in an indictment that has been dismissed by the government, *e.g., United States v. Marines*, 535 F.2d 552, 554 (10th Cir. 1976); hearsay evidence, *e.g.,*

---

**19.** The question usually concerns whether the sentencing judge may consider a defendant's acquittal in a *prior* trial, rather than the evidence introduced in the same trial going to counts on which the defendant is acquitted. *See, e.g., Drayton v. New York*, 556 F.2d 644, 646 (2d Cir.), *cert. denied*, 434 U.S. 958, 98 S.Ct. 488, 54 L.Ed.2d 317 (1977); *United States v. Marines*, 535 F.2d 552, 554 (10th Cir. 1976); *United States v. Bowdach*, 561 F.2d 1160, 1175 (5th Cir. 1977); *United States v. Haygood*, 502 F.2d 166, 171–72 (7th Cir. 1974), *cert. denied*,

419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 812 (1975); *United States v. Atkins*, 480 F.2d 1223, 1224 (9th Cir. 1973). The cases uniformly allow consideration of prior acquittals, although the effect of this consideration is not always clear. *See, e.g., United States v. Morgan*, 595 F.2d 1134, 1137 (9th Cir. 1979) ("it is just as reasonable to assume that [the trial court's] consideration of the acquittal resulted in his imposing the relatively light sentence of two years, as it is to assume ... that his sentence was 'enhanced' because of the prior acquittal").

*Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959); evidence obtained in violation of the Fourth Amendment, *e.g.*, *United States v. Lee*, 540 F.2d 1205, 1210–11 (4th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); and the defendant's refusal to cooperate with the government in an investigation of the conspiracy in which he was a confessed participant, *e.g.*, *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

On the other hand, it is also fundamental that *some* limitation on the range of permissible sentencing considerations is required by the constitutional guarantee of due process. It is well established, for example, that a sentence is invalid if it is based upon "improper or inaccurate information." *Dorszynski v. United States*, 418 U.S. 424, 431 n.7, 94 S.Ct. 3042, 3047 n.7, 41 L.Ed.2d 855 (1974). *See, e.g., Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (prohibiting consideration of false information); *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (sentence may not be based upon prior convictions obtained in violation of the principles found in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); *United States v. Weston*, 448 F.2d 626, 634 (9th Cir. 1971), *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972) (trial court may not rely on information contained in pre-sentence report "unless it is amplified by information such as to be persuasive of the validity of the charges there made"). Appellants contend that a judicial finding of guilt on charges on which the jury returns a verdict of not guilty "is as effective a denial of the right to a jury trial as if the judge had refused to empanel one in the first place." Brief for Appellant Campbell at 25.

In *United States v. Sweig*, 454 F.2d 181 (2d Cir. 1972), the Second Circuit held that it was proper for the trial court to consider evidence bearing on charges of which the defendant had been acquitted.

Acquittal does not have the effect of conclusively establishing the untruth of all the evidence introduced against the defendant. For all that appears in the record of the present case, the jury may have believed all such evidence to be true, but have found that some essential element of the charge was not proved. *Id.* at 184. Although this proposition is obvious, its strength has been undercut in recent years by the reaffirmation of the collateral estoppel principles that are mandated by the Double Jeopardy Clause. Almost a century ago, the Supreme Court ruled that after a defendant had been acquitted of evading taxes on distilled liquor, the government could not begin new proceedings to obtain the forfeiture of his distilling equipment.

It is urged as a reason for not allowing such effect to the judgment, that the acquittal in the criminal case may have taken place because of the rule requiring guilt to be proved beyond a reasonable doubt, and that, on the same evidence, on the question of preponderance of proof, there might be a verdict for the United States, in the suit *in rem*. Nevertheless, the fact or act has been put in issue and determined against the United States . . . .

*Coffey v. United States*, 116 U.S. 436, 443, 6 S.Ct. 437, 440, 29 L.Ed. 684 (1886). *See Standlee v. Rhay*, 403 F.Supp. 1247 (E.D. Wash.1975) (parole revocation barred by parolee's acquittal of criminal charges based on same offense said to require revocation, despite lower standard of proof in revocation proceedings). More recently, the Supreme Court held in *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), that the Double Jeopardy Clause prohibits a second criminal prosecution for a greater as well as a lesser offense. *See generally Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). As a result, we have explicitly held that evidence that has been the subject of a count of which defendants have been acquitted in an earlier trial is inadmissible in a second trial under the doctrine of collateral estoppel. *Green v. United States*, 426 F.2d 661 (D.C. Cir.1970); *United States v. Day*, 591 F.2d 861 (D.C.Cir.1978).

The jury's acquittal is a final and binding determination that Sheffey was not guilty of those charges. Hence, in a second trial the Government cannot introduce evidence with the aim of contradicting any ultimate fact concluded by that judgment. We are convinced that the ultimate facts upon which the Government relies to support its claim that Sheffey is guilty of the offenses charged in the second trial are the same ultimate facts that the jury in the first trial found did not exist. Hence, to the extent that the Government seeks to use evidence introduced at the first trial to support a claim against Sheffey contrary to the facts essential to the judgment in that case, it is collaterally estopped from doing so.

*Id.* at 869.

We therefore decline to pursue *Sweig* to its ultimate reading, because a judgment of acquittal is a more final and binding determination of facts than the requisite standard of proof might at first seem to allow. At the same time, *Sweig* is doubtless correct in recognizing that the trial judge can hardly avoid exposure to all the evidence that is presented during the course of a trial.

> In fact the kind of evidence here objected to may often be more reliable than the hearsay evidence to which the sentencing judge is clearly permitted to turn, since unlike hearsay, the evidence involved here was given under oath and was subject to cross-examination and the judge had the opportunity for personal observation of the witnesses.

454 F.2d at 184. In this case, the government argues that "the trial court should not be required to sift from the totality of the evidence only those isolated facts bearing directly on the counts as to which the verdict of guilty was returned." Government Brief at 103.

 Perhaps no single duty of a trial judge is more onerous and more unpleasant

than sentencing. After years of study, it is still not possible to identify precisely the factors that go into this decision.[20] Indeed, as the dissenting opinion noted in *United States v. Grayson*, problems of this sort are subject to appellate review

> only because of the trial judge's laudable explication of his reasons for imposing the sentence in this case. In many cases it would be impossible to discern whether a sentencing judge had been influenced by his belief [about the evidence], since there is no requirement that reasons be given.

438 U.S. at 55 n.1, 98 S.Ct. at 2618 n.1 (Stewart, J., dissenting). We should not adopt an unrealistic view of the sentencing process that can only deter trial judges from articulating their reasons fully, because those reasons allow correction when the facts relied upon are indeed "inaccurate." Judges ought not be reprimanded for acknowledging the impact of the evidence presented during the trial unless the weighing in of such evidence confounds a just result. Accordingly, when cases of this nature are heard on appeal, we should review the record to ensure that there is a persuasive basis for the conclusions reached by the sentencing court.

 Applying this standard, we perceive no basis for disturbing the court's sentence. The allegations concerning the liquor were eliminated from the third count of the indictment by the government, but only because this transaction fell outside the statute of limitations for bribery. Tr. 4–5. These charges remained in the conspiracy counts, and were the basis of "unrefuted evidence." *See* Tr. 764–66, 934–36, 994–1005. Ordinarily, we would be less certain in assessing the trial court's judgment that "Jenkins lied during some of his testimony in order to protect this defendant," Sent. Tr. 39, because assessing witness credibility is a task that is primarily within the province of the jury and for which courts of appeal, relying only on the sterile record,

---

**20.** *See generally* A. CAMPBELL, LAW OF SENTENCING (1978); M. FRANKEL, CRIMINAL SENTENCES: LAW WITHOUT ORDER (1973).

are particularly ill-suited. In *Grayson*, however, the Supreme Court specifically held that a sentencing judge could consider the defendant's false testimony observed by the court during the trial. 438 U.S. at 50–54, 98 S.Ct. at 2615–17. "No rule of law, even one garbed in constitutional terms, can prevent improper use of first-hand observations of perjury. The integrity of the judges, and their fidelity to their oaths of office, necessarily provide the only, and in our view adequate, assurance against that." *Id.* at 54, 98 S.Ct. at 2617. Accordingly, we must affirm the trial court's approach to the arduous sentencing task in this case.

## CONCLUSION

We have discussed the appellants' arguments at some length because these arguments were all far from frivolous and because they stem from a lengthy and difficult trial challenging the capacity of the judicial system to judge a judge and his criminal co-conspirator fairly. The distinction between bribery and illegal gratuities can be subtle, and we emphasize again the importance of clearly drawing this distinction in jury instructions. *See Brewster*, 506 F.2d at 68. Allegations of jury misconduct and improper sentencing must be considered grave, because either activity undermines the integrity of the criminal justice system. While we need not agree with the broad statements in *Sweig*, we find nothing improper in the trial court's sentencing here, and the jury's behavior in this case was not the sort that justifies overturning a verdict. It is always possible after a lengthy trial to allege that certain evidence was improperly admitted and that certain jury instructions were erroneous, but these claims lose a great deal of their force when counsel was not moved to object at the relevant time. "It is a commonplace in the administration of criminal justice that the actualities of a long trial are too often given a meretricious appearance on appeal; the perspective of the living trial is lost in the search for error in a dead record." *Glasser v. United States*, 315 U.S. 60, 88, 62 S.Ct. 457, 473, 86 L.Ed. 680 (1942)

(Frankfurter, J., concurring). Finally, we agree with the trial court that there was sufficient evidence from which the jury could return its verdict of guilt.

We believe that justice has served Judge Campbell better than he served it. He and his co-conspirator have no legal cause for complaint.

*Affirmed.*