**In re Robert H. CAMPBELL, Respondent.**

**No. M–90–81.**

District of Columbia Court of Appeals.

Argued Sept. 17, 1986.

Decided March 23, 1987.

1. These facts set forth in the opinion are extensively amplified in the 35–page report of the Hearing Committee and the 47–page Report and Recommendation of the Board. That Report includes the dissenting opinion by four of the nine members of the Board, who concluded that Respondent's offense fell "just short" of a crime involving moral turpitude. The Hearing Committee had come to a similar conclusion.

2. That subsection reads:
  (g) Whoever, being a public official, former public official, or person selected to be a

R. Kenneth Mundy, Washington, D.C., for respondent.

Michael S. Frisch, Asst. Bar Counsel, with whom Thomas H. Henderson, Jr., Bar Counsel, Washington, D.C., was on the briefs, for Office of Bar Counsel.

Before FERREN and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.

PER CURIAM:

Before us is a recommendation from the Board on Professional Responsibility that former Superior Court Judge Robert H. Campbell be disbarred under the provisions of D.C.Code § 11–2503(a) (1981). That section mandates disbarment for a "member of the bar of the District of Columbia Court of Appeals [who] is convicted of an offense involving moral turpitude." We agree with and carry out this recommendation.

The basic facts in this case are set forth in Respondent's direct appeal from his conviction. *United States v. Campbell,* 221 U.S.App.D.C. 367, 684 F.2d 141 (1982).[1] In short, Respondent was convicted under 18 U.S.C. § 201(g)[2] for receiving an illegal gratuity by accepting moving services from a trucking firm in connection with the transfer of his household goods from one house to another. Both prior and subse-

public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him ... [s]hall be fined not more than $10,000 or imprisoned for not more than two years, or both.
Section 201 is headed "Bribery of public officials and witnesses," and is part of "Chapter 11—Bribery, Graft, and Conflicts of Interest."

quent to the offense, the trucking firm appeared numerous times as a defendant in cases before Respondent.

In our jurisprudence with respect to offenses "involving moral turpitude," we have distinguished between offenses which inherently involve moral turpitude by virtue of their underlying elements, and those which do not. The threshold focus, then, is on the type of crime committed rather than on the factual context surrounding the actual commission of the offense. If it is determined that the particular offense inherently involves moral turpitude, that is the end of the inquiry. If the particular offense does not involve moral turpitude *per se*, then an inquiry is made into the specific facts of the individual offense to determine whether, on those facts, an offense involving moral turpitude was committed. *In re Colson*, 412 A.2d 1160, 1164–65 (D.C.1979) (en banc). In the case before us, the Board made a determination that the crime of receiving an illegal gratuity does not involve moral turpitude *per se* and referred the matter to a Hearing Committee to "examine the circumstances of Respondent's particular offense." The Hearing Committee concluded that Respondent's offense on its facts did not involve moral turpitude,[3] but a majority of the Board has disagreed and recommended disbarment under the terms of the statute.

We begin with an examination of the precise elements of the offense. The trial court instructed the jury that to be convicted under the statute, Respondent must have received the gratuity "for or because of an official act performed or to be performed" by him, and that in addition he must have acted "knowingly and willfully." 221 U.S.App.D.C. at 373, 684 F.2d at 147.[4]

In his direct appeal, Campbell challenged the sufficiency of these instructions. He argued that the trial court erred in not requiring the jury to find that the gratuity was conferred with "specific knowledge" of "a definite official action for which compensation was intended." Campbell claimed that "if [the trucking company official] provided a move of household belongings to Judge Robert Campbell because he felt that Judge Campbell had been (or would be) generally lenient with respect to [the trucking company's] overweight citations, this would *not* be sufficient for culpable intent"—an assertion that the appeals court rightly characterized as "somewhat startling." 221 U.S.App.D.C. at 375, 684 F.2d at 149. While the court acknowledged that as a general proposition, it was no easy task to articulate the requisite intent necessary to constitute accepting or giving an illegal gratuity,[5] it had "no doubt" that the jury here clearly understood the requirement that the gratuity be received "knowingly and willfully" and "for or because of an official act."

Citing *United States v. Brewster*, 408 U.S. 501, 527, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972), and on appeal after remand, 165 U.S.App.D.C. 1, 506 F.2d 62 (1974), the court drew a sharp distinction between the situation faced by a United States senator, an elected official, in distinguishing between legitimate campaign contributions and illegal gratuities, and that faced by a sitting judge, particularly, we might add, one who is (as Judge Campbell) appointed rather than elected. "[N]o similar problems attend deciding whether a

---

**3.** The Hearing Committee did conclude that Respondent violated DR 8–101(A)(3) on the ground that Respondent had accepted the household moving services under circumstances where he "knows or it is obvious that the offer is for the purposes of influencing his action as a public official." The Board unanimously agreed with the committee on this point. In light of our disposition of this case, we need not reach any issues of violation of disciplinary rules.

**4.** The other three elements of the offense required the jury to find (a) that he received the moving assistance; (b) that he was a public official at the time (the section defines public

officials to include District of Columbia officials, 18 U.S.C. § 201(a)); and (c) that he acted "otherwise than as provided by law in the proper discharge of official acts." 221 U.S.App.D.C. at 373 n. 10, 684 F.2d at 147 n. 10.

**5.** The crime of receiving an illegal gratuity is distinguished from that of bribery, 18 U.S.C. § 201(c) in part by the fact that for bribery, the defendant must act "corruptly." *United States v. Brewster*, 165 U.S.App.D.C. 1, 10, 506 F.2d 62, 71 (1974). Respondent was acquitted of all bribery charges.

judge has accepted gifts 'with knowledge that the donor was paying him compensation for an official act.'" *Campbell, supra,* 221 U.S.App.D.C. at 376, 684 F.2d at 150.[6]

Before us, as before the Board, Respondent in substance attempts to reargue his conviction by negating the existence of criminal intent, such as by stressing his payment of $60 to the three trucking company employees and his attempt to pay their supervisor as well. He made the same assertion before the appellate court in his direct appeal and it was rejected.

> Judge Campbell's defense sought to negate the existence of criminal intent. It emphasized that Judge Campbell gave $60 to the three ECI employees who assisted during the five-hour move, and that Judge Campbell sought to pay their supervisor, Jones, as well. When Jones refused to take any money for his own time or to let Judge Campbell pay for a truck that Jones had already rented, Judge Campbell "was confronted, not of his own volition or choice, with a gratuity ... of such a nature that he could not give it back."
>
> Although this version of events could be believed, there was clearly sufficient evidence from which the jury could conclude beyond a reasonable doubt that it was not so. There was credible evidence to suggest that Jenkins arranged the move pursuant to a meeting with Judge Campbell, that the $60 was intended as a tip rather than as payment for the value of the services given, and that Judge Campbell knew the movers' assistance was a gratuity rendered for or because of his official acts. It was for the jury to resolve the question of Judge Campbell's intent based on this evidence, and we find no occasion to disturb its verdict.

221 U.S.App.D.C. at 372, 684 F.2d at 146 (footnote & citation omitted). We cannot again revisit the argument on the facts.

They were determined by the jury and by the Board. By our own rules, we are bound by such factual findings "unless they are unsupported by substantial evidence of record," not the case here. D.C. Bar Rule XI, § 7(3). Furthermore, the guilty finding by the jury is "conclusive evidence of the commission of that crime" in subsequent disciplinary proceedings. D.C. Bar Rule XI, § 15(3).

The statute proscribing illegal gratuities is sweeping in its scope. It covers all public officials whether they be in the executive, legislative or judicial branch. In *Attorney Grievance Commission v. Brewster,* 280 Md. 473, 374 A.2d 602 (1977), it was held that the receipt of an illegal gratuity by a United States senator did not constitute moral turpitude *per se* "viewed in the light of contemporary campaign financing." 374 A.2d at 604. We express no opinion as to cases involving government officials in the executive or legislative branches. We deal here with a member of the judiciary. He was found guilty of accepting a gratuity knowing that it was being given to him for or because of an official act performed or to be performed by him as a member of the judiciary.

Recently, in *In re Wolff,* 490 A.2d 1118, 1119 (D.C.1985), an opinion adopted by the en banc court in *In re Wolff,* 511 A.2d 1047 (D.C.1986), we acknowledged that the phrase "moral turpitude" eludes precise definition but reiterated as helpful the three alternate definitions set forth in *In re Colson, supra:*

> (1) The act denounced by the statute offends the generally accepted moral code of mankind;
>
> (2) The act is one of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man; or

---

**6.** The internal quote is from *United States v. Brewster, supra,* 408 U.S. at 527, 92 S.Ct. at 2544, where the Court observed that in order to sustain a conviction for receiving an illegal gratuity, "it is necessary to show that appellee solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act. Inquiry into the legislative performance itself is not necessary; evidence of the Member's knowledge of the alleged briber's illicit reasons for paying the money is sufficient to carry the case to the jury."

(3) Conduct contrary to justice, honesty, modesty, or good morals.

*Id.,* 412 A.2d at 1168. If acceptance by a sitting judge of a gratuity from one regularly appearing before him or her knowing that the gratuity is being rendered for or because of official actions taken by that sitting judge is not inherently a crime of moral turpitude, at the very least it creates a compelling presumption to that effect which would be overcome only by convincing evidence that a particular incident fell without the orbit of moral turpitude. We think the Report of the Board majority, in concluding in Part II(D) that "respondent's criminal offense involved moral turpitude," correctly captures society's expectations for members of the judiciary.[7] On the facts presented to us here, we do not doubt that the act for which Judge Campbell was convicted constitutes "an offense involving moral turpitude" within the meaning of D.C.Code § 11–2503(a).

Accordingly, it is ordered that respondent be disbarred pursuant to D.C.Code § 11–2503(a) (1981).

*So ordered.*

### APPENDIX

### BOARD ON PROFESSIONAL RESPONSIBILITY

### DISTRICT OF COLUMBIA

Robert H. Campbell

Bar Docket No. 18–81

### REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

D. Respondent's Criminal Offense Involved Moral Turpitude

In this proceeding, the Board has used general principles of collateral estoppel to determine the underlying facts constituting Judge Campbell's "offense" for which he was "convicted" and has evaluated those facts under the legal standard of "moral turpitude" set forth in the Court's controlling opinion. The conclusion of the Board's majority is that Judge Campbell's "offense" did involve moral turpitude.

We, as lawyers, face with dread the determination of what crimes involve "moral turpitude." First, the question of what offends the "generally accepted moral code of mankind" smacks of metaphysics. The vagueness and relativity of the inquiry make lawyers, who prefer precision and bright lines, uncomfortable. Second, the consequences of our determination are so draconian that the sanction tends to influence the outcome on the merits. None of us is comfortable in trying to say definitively what is base, vile, or depraved, particularly when our venture into such heady considerations carries with it the disciplinary equivalent of a death sentence.

Nevertheless, the legislature and the District of Columbia Court of Appeals have charged us with the responsibility of saying what we think, and we must do so without reference to the sanction, which has been set by the legislature, and without reference to our squeamishness about speaking for mankind as to its moral code.

Before we turn to the particular facts underlying Judge Campbell's conviction, we pause to say that one of the circumstances that we have considered in arriving at our determination is that Judge Campbell was a judge when the acts leading to the conviction occurred. Like the Hearing Committee, we find it tempting to say that an act of this type is *per se* morally reprehensible when committed by a judge. However, reflection enables us to imagine cases in which a judge might accept a gratuity without necessarily committing an act involving moral turpitude.

While no *per se* rule can be applied in this situation, nevertheless, we have considered in general what is expected of judges, particularly in contrast to other public officials. It seems to us that citizens are prepared to accept a certain amount of human fallibility on the part of their judges. It is generally conceded that some judges are more temperamentally suited to the task than others, that some judges are more analytical than others,

---

**7.** That portion of the Report is attached as an Appendix.

that some judges work harder than others, and that some judges are more result-oriented than others. Since judges are, after all, human beings, we are prepared to accept a certain amount of variability among them.

However, when one contemplates the essence of judicial office, society commits enormous power into the hands of judges, particularly trial judges, because of an abiding faith that those judges will act impartially and without fear or favor. First, it is well to dwell for a moment upon the extent of the power granted to judges. Many of the decisions made by trial judges are unreviewable either as a practical matter or by operation of law. A trial judge's decisions on evidence are one example of an area in which the discretion granted is so broad as to insulate most of the decisions that a judge makes. In the area of sentencing, which is the very power at issue in this case, the trial judge's decision is absolutely unreviewable as a matter of law.

Society grants judges such enormous power exactly because of its confidence that judges will act fairly and impartially. Another aspect of the fairness and impartiality that most people expect of judges is that they will not seek to profit by their judicial office. That is to say, the judges' salaries are thought to be all of the compensation that they should draw from their office, and they should not look elsewhere for remuneration on account of their office.

One aspect of our desire for fairness and impartiality in judges is easy to see. No one would say that judges should be able to sell to the litigants before them the decisions that they are empowered to make in order to profit personally. That is the very heart of the bribery offense, an offense that is not involved in this case. However, there are other aspects of this same doctrine.

One of them is that judges must not only be forbidden to sell the decisions that they make, but they must not appear to do so. In other words, the appearance of justice is as important as the fact of justice where those who sit in judgment are concerned. It is precisely because of our strongly held feelings about the appearance and the fact of impartiality that judges are subject to the excruciatingly high ethical standards that we impose on them. Those ethical standards are not at issue here, but in deciding what constitutes moral turpitude, we are confronted with a statute, the gratuity statute, that protects another aspect of the same constellation of values.

Plainly, the idea behind the gratuity statute is that if judges accept things of value from litigants in their courts, even if they never favor or indulge those litigants, the office is prostituted, and the appearance of impartiality is lost.

Because our legal system is largely a consensual system, by which we mean that most decrees of most courts are observed not only because of the power of the court to punish or levy upon those against whom they judge but also because of a general sense of the fairness of results that courts reach. Put another way, society must protect the integrity of the judicial system so that people will submit their disputes to that system and abide by its judgments, at least in part, of their own free will.

What Judge Campbell did in this case debased and demeaned his office. There is no question that ECI was a corporation that appeared before the judge in a large number of cases. Therefore, his power to benefit or to harm the corporation, whether used improperly or not, was particularly extensive.

Second, Judge Campbell took a thing of value from ECI, and the taking was not casual or accidental. As the Hearing Committee noted, whether Judge Campbell asked ECI for moving services or whether Jenkins offered them, the fact is that the use of ECI's services for moving Judge Campbell's household goods was prearranged. The conviction by the jury establishes that Judge Campbell did not, as he claimed, pay for those services.

Third, the jury's verdict preclusively establishes that the gratuity was given "for or because" of Judge Campbell's judicial office. The distinction here is not a subtle or difficult one. A friend of Judge Campbell's who never appeared before him

might have given him anything he wanted. Indeed, there was testimony in this case that Max Ammerman gave or loaned Judge Campbell quantities of money on more than one occasion, but there was no evidence that Mr. Ammerman had any litigation before Judge Campbell. Thus it was not proven that Ammerman's gifts or loans were "for or because" of Judge Campbell's judicial office. ECI's gifts, on the other hand, clearly were, and the jury so found.

Our point is that for judges to accept money from litigants in their courts, even though they in fact do nothing to favor those litigants, strikes at the core of the impartiality demanded of judges. That impartiality is a generally recognized, and highly valued, characteristic of judges. Therefore, an act that debases or demeans the judicial office by breaching the integrity of the office is one that offends the generally accepted moral code of mankind.

Even when one looks beyond judges, we believe that American public opinion, particularly in recent years, has regarded as morally wrong the receipt of gratuities by public officials even when they have a less direct relationship to the donor than does a judge to a litigant who regularly appears before him. The disclosure that members of the White House staff in the Truman Administration had received vicuna coats and a deep freeze was regarded as a scandal. Sherman Adams resigned his post in the Eisenhower Administration when it was disclosed that he received money from a financier. The question whether Edwin Meese improperly received gratuities was a matter referred to a special prosecutor, and Richard Allen gave up his office when it was established that he had received three expensive watches. On a number of other occasions, there has been a public outcry when it was learned that defense officials were lavishly entertained by defense contractors. Even now, the question of whether Admiral Rickover received gratuities from those over whom he wielded official power is being closely scrutinized.

It is therefore difficult for us to believe that a sitting judge could be unaware that to accept a substantial gratuity from a corporation that regularly came before him for sentencing was contrary to the accepted standards of public morality. As we understand the *Colson* case, conduct contrary to the generally accepted standards of public morality is conduct involving moral turpitude.[1]

Having read the Hearing Committee's thoughtful report with care, we cannot escape the conclusion that the Hearing Committee may have been influenced in its conclusion that Respondent's conduct was not "inherently wrong" because it believed the penalty of permanent disbarment to be too harsh in this case. We too may well wish that the statute were less rigid and that it permitted consideration of various

1. We are aware that in *Attorney Grievance Commission v. Brewster*, 374 A.2d 602 (Md.1977), the Maryland Court of Appeals [held that] former Senator Brewster's conviction under 18 U.S.C. § 201(g) for accepting an illegal gratuity was not a crime involving moral turpitude as that term is defined in the disciplinary code. (Maryland does not have a permanent disbarment statute such as exists in the District of Columbia; the distinction is not important however since our Court of Appeals has held that moral turpitude in the disciplinary rules is the same thing as moral turpitude in the statute, *In re Price*, _____). In the *Brewster* case, the Senator was charged with bribery, acquitted of bribery, and ultimately pleaded guilty to the lesser included offense of accepting an illegal gratuity. Several factors lead us to believe that the result in *Brewster* is not controlling in this case. First, Bar Counsel in the *Brewster* case refused to present any of the facts surrounding Senator Brewster's conviction, arguing instead that "ac-

cepting an illegal gratuity constituted moral turpitude on its face ..." 374 A.2d at 603. The Board has already agreed with the Maryland court's rejection of this argument when it found that a conviction of accepting an illegal gratuity does not involve moral turpitude *per se*. However, one of the most important facts developed by Bar Counsel in this case, and the fact that ultimately distinguishes this case in our minds from the *Brewster* case, is the fact that Judge Campbell was a judge when the acts underlying his conviction were committed. In light of our discussion about the nature of the judicial office, we feel that the fact of Judge Campbell's judicial office alone distinguishes this case from *Brewster*. Finally, we are constrained to say that even if *Brewster* were indistinguishable from this case, in light of the fact that the *Brewster* case is not controlling on the District of Columbia Court of Appeals, we respectfully suggest that the Maryland Court of Appeals reached the wrong result.

factors. The majority of the Board does not, however, believe that the rigidity of the statute justifies a finding that it is not moral turpitude for a judge to accept a gratuity from a litigant who regularly appears before him knowing that the gratuity is being given because of the judge's official position with respect to that litigant.

FERREN, Associate Judge, concurring:

I join in the opinion of the court. I continue to believe, however, that the statute mandating disbarment for conviction "of an offense involving moral turpitude," D.C.Code § 11–2503(a) (1981), does not preclude reinstatement pursuant to D.C. App.R. XI, § 21(2), upon a showing of rehabilitation and competence to practice law after the expiration of at least five years from the effective date of the disbarment. *In re Kerr*, 424 A.2d 94, 99 (D.C.1980) (Ferren, J., dissenting); *see In re Wolff*, 511 A.2d 1047 (D.C.1986) (en banc).