**Monroe W. SCOTT, Jr., Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 85–206, 86–423.**

District of Columbia Court of Appeals.

Argued Feb. 18, 1987.
Decided Dec. 4, 1987.[*]

_____

* This opinion was released in typed form prior to printing.

Maureen T. Cannon, Public Defender Service, with whom James Klein and Jennifer P. Lyman, Public Defender Service, were on the brief, for appellant.

Saul M. Pilchen, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Zinora M. Mitchell, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS and STEADMAN, Associate Judges, and NEBEKER, Associate Judge, Retired.[**]

NEBEKER, Associate Judge, Retired:

These consolidated appeals stem from appellant's conviction by a jury of a single count of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1981 & Supp.1986), and a denial of collateral relief under D.C.Code § 23–110 (1981). Reversal is sought primarily in the collateral attack proceeding on the ground of the trial judge's failure to disclose his then ongoing negotiations for an attorney position with the Department of Justice. The Department of Justice is the federal entity under which this jurisdiction's federal prosecuting authority, the United States Attorney's Office, operates. Appellant submits that the trial judge's undisclosed conflict of interest while presiding over his trial and sentencing deprived him of due process of law. Appellant also assigns as reversible errors in the direct appeal the judge's refusal to instruct the jury on his claim of self-defense, and prosecutorial misconduct during closing arguments. We affirm appellant's conviction and the order denying collateral relief, but for the reasons discussed below, we remand for resentencing.

In October 1984, appellant was indicted for the instant offense as well as for additional counts of assault with a deadly weapon and obstruction of justice. The charge on which he was ultimately convicted, assault with intent to kill while armed, was based on an incident earlier that year in which appellant stabbed one Herbert Hayes with a knife during a fist fight between the two men. The other charges stemmed from an incident occurring a few months thereafter in which appellant was said to have slashed the hand of a principal witness to the Hayes assault and threatened the witness in connection with his anticipated testimony.

A jury trial on the indicted offenses was held before the Honorable Tim C. Murphy in late November and early December 1984. After the government presented its case-in-chief, and upon defense motion, Judge Murphy directed a verdict of acquittal for appellant, but only as to the charge of assault with a deadly weapon. The defense then proceeded with its case which, as to the remaining assault charge, rested on a theory of self-defense. Appellant did not testify on his own behalf. The jury, after hearing all the evidence on both incidents, convicted appellant for his aggravated assault on Hayes and acquitted him of obstruction of justice. In January 1985, Judge Murphy sentenced appellant to a term of imprisonment of twelve to thirty-six years and fined him $500. The sentence was to run concurrently with a sentence imposed on appellant by another Su-

[**] Judge Nebeker was an Associate Judge of this court at the time the case was argued. His status changed to Associate Judge, Retired, on September 1, 1987.

perior Court judge in an unrelated matter. Appellant then timely filed a notice of appeal.

Several months later, in August 1985, appellant moved to vacate his sentence under § 23–110, raising for the first time the conflict arising from Judge Murphy's negotiations with the Department of Justice during the period of appellant's trial and sentencing. As his direct appeal was still pending, appellant successfully moved to hold the appellate proceedings in abeyance until the § 23–110 motion was acted upon by the trial court. In February 1986, the trial court (Walton, J.) denied the motion to vacate without an evidentiary hearing and without actually reaching the merits of the issue presented, citing *Womack v. United States,* 129 U.S.App.D.C. 407, 395 F.2d 630 (1968). The court held that an evidentiary hearing was not required because the facts bearing on the merits, as fully recounted in an affidavit from Judge Murphy, were not in dispute.[1] We agree with the parties that the merits of the due process claim are before us on an adequate record. We proceed first with this disclosure or recusal issue.

## I.

The undisputed facts are that on October 23, 1984, Judge Murphy attended a reception following the investiture of a newly appointed Superior Court judge where he met the Director of the Office of Management Information, Services and Support (OMISS) of the Department of Justice's Executive Office for United States Attorneys (EOUSA). Judge Murphy had known the Director from the days the latter prosecuted cases before him as an Assistant United States Attorney. In the course of their conversation, Judge Murphy mentioned that he was contemplating a career change in 1985.[2] In response, the Director informed the judge that the position of

Assistant Director for the Debt Collection Staff of OMISS had been vacant since July 1984. He said that the available position was managerial in nature and did not directly involve litigation. As explained to Judge Murphy, the Debt Collection Staff provided policy and oversight guidance to the debt collection units of the United States Attorney's Offices across the country. OMISS, under which the Debt Collection Staff operated, had essentially a record-keeping and computer systems management function.

On October 31, 1984, and then again on December 10, Judge Murphy and the Director discussed the directorship vacancy over lunch. On these occasions, the position was described to the judge in detail and was then offered to him "subject to higher approval."[3] In the interim, Judge Murphy presided over appellant's jury trial. The case had been certified to the judge by the Felony Clerk's Office on November 15, 1984. On November 23, Judge Murphy conducted a hearing at which he denied appellant's motion for review of detention and for bond pending trial. A separate pretrial hearing on appellant's motion to suppress identification evidence was held before Judge Murphy on November 29. This motion was also denied. On November 30, the jury was impaneled and trial commenced. Following the completion of the trial on December 4, appellant was convicted as charged for the assault on Hayes, and acquitted of the obstruction of justice charge.

On December 24, 1984, Judge Murphy advised the Director of OMISS of his interest in the position and asked him to discuss the matter with his superiors. Judge Murphy was formally offered the job on or about February 6, 1985. Approximately one week beforehand, on January 28, the judge had sentenced appellant on his December 4 conviction to the prison term and

---

1. In his motion papers, appellant conceded that Judge Murphy's affidavit obviated the need for an evidentiary hearing.

2. Judge Murphy was not actively searching for a new job at the time.

3. Judge Murphy's affidavit does not make clear at which luncheon engagement the conditional offer was extended to him. For purposes of this appeal, we think it is enough to know that the prospect of his employment at the Department of Justice was seriously discussed at both meetings.

fine mentioned above. Then on February 8, Judge Murphy informed the late Chief Judge H. Carl Moultrie I and the Commission on Judicial Disabilities and Tenure of his decision to leave the bench by April 15, 1985, to accept the new position.

Appellant learned of Judge Murphy's negotiations with the Department of Justice approximately two weeks after he was sentenced when an article announcing the judge's retirement and his acceptance of a position with the department appeared in a local newspaper. Judge Murphy had not disclosed the fact of these negotiations to the parties or counsel either before or during the proceedings on appellant's trial and sentencing. In his affidavit, however, Judge Murphy declared that "[his] discussions with [the Director] in no way influenced [his] trial or sentencing decisions."

Appellant contends that Judge Murphy's failure to disclose his then-potential employment interest at the Department of Justice, while presiding over a criminal case, both violated the Code of Judicial Conduct and denied him the due process required by the fifth amendment. Significantly, in his brief to this court and at oral argument, counsel for appellant conceded that there is no basis for concluding Judge Murphy was actually biased against him as a result of the employment negotiations. Simply stated, appellant's due process challenge rests on the theory that he was denied a fair trial because of the "appearance of partiality" created by the judge's failure to disclose his conflict of interest or, in the alternative, to recuse himself from the case. The government counters that Judge Murphy did not violate the judicial code by participating in this case because, given the nature of his negotiations with the department and the type of position he was seeking, no reasonable person would have questioned his ability to preside impartially. On this point, the government emphasizes how far removed the judge's duties with OMISS's debt collection unit, which are managerial in kind and national in scope, are from the Justice Department's prosecution

of local criminal matters in the Superior Court through this jurisdiction's United States Attorney's Office. The government argues alternatively that even if a violation of the judicial code is deemed to have occurred, the violation is not of the sort which implicates the denial of due process and requires reversal of the conviction.

Appellant specifically contends that reversal is warranted because Judge Murphy violated Canon 3(C)(1) of the American Bar Association's Code of Judicial Conduct which was adopted for the District of Columbia courts in 1973 by the D.C. Joint Committee on Judicial Administration. *E.g., In re Evans*, 411 A.2d 984, 996 (D.C. 1980). That canon provides in relevant part that "[a] judge should disqualify himself in a proceeding in which his impartiality *might reasonably be questioned.*" *ABA/BNA Lawyers' Manual on Professional Conduct*, at 01:3003 (Oct. 17, 1984) (emphasis added). By way of illustration, the canon calls for disqualification in instances such as where the presiding judge "has a personal bias or prejudice concerning a party" or knows that he has an "interest that could be substantially affected by the outcome of the proceeding." *Id.* at 01:3003–3004, Canon 3(C)(1)(a) and (c). However, disqualification is not automatically required: in certain limited situations the parties may consent to the judge's participation in the case after he has properly disclosed the basis for recusal. *See id.* at 01:3005, Canon 3(D).

 It is generally held that Canon 3(C)(1) imposes an objective criterion on courts when disqualification is indicated. That is, under the code a judge is required to recuse himself from any case in which his participation evinces "an *appearance* of bias or prejudice sufficient to permit the average citizen reasonably to question [the] judge's impartiality." *United States v. Heldt*, 215 U.S.App.D.C. 206, 239, 668 F.2d 1238, 1271 (1981) (emphasis in original), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).[4] Hence, a judge's

---

4. *Heldt* and the cases on which appellant principally relies, *e.g., Potashnick v. Port City Construction Company*, 609 F.2d 1101 (5th Cir.), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.

subjective view of his ability to preside impartially is irrelevant. *See Potashnick, supra,* note 4, 609 F.2d at 1111. Moreover, as appellant contends and as the government acknowledges, there is no requirement that bias in fact or actual impropriety be established in order to make out a violation of the canon.

■ We begin on the assumption that Canon 3(C)(1) was violated in this case. That is not the controlling issue before us.[5] Rather, the question is what is to be done when this particular violation is being dealt with on appeal, that is, whether for this reason, appellant is entitled to a new trial. Every transgression of Canon 3(C)(1), without more, is not a denial of due process requiring reversal.[6] In reviewing a judgment of conviction from a case tried before a jury, as this one was, this court only considers errors of law. D.C.Code § 17–305(a) (1981). If an error of law was committed, we must usually then deter-

mine whether it affected the substantial rights of the defendant. *Id.* § 11–721(e). In other words, we must decide whether the error present was harmless under the circumstances. *See Towles v. United States,* 428 A.2d 836, 843–44 n. 6 (D.C.1981) (§ 11–721(e) is the codification of harmless error rule). Only if it did affect substantial rights would reversal of the conviction be warranted. D.C.Code § 11–721(e).

As the harmless error analysis attests, it does not necessarily follow from the assumed violation of Canon 3(C)(1) that appellant was denied due process. True it is that a trial infected by the appearance of possible partiality may implicate error of constitutional gravity. The requirement of due process

> may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending par-

---

2d 22 (1980), apply this standard pursuant to 28 U.S.C. § 455(a) (1982), the federal statutory counterpart of the American Bar Association's Canon 3(C)(1). Although the statute basically tracks the judicial canon, it explicitly mandates recusal by providing that a judge "shall" disqualify himself whenever his impartiality might reasonably be questioned. Canon 3(C)(1), on the other hand, contains the discretionary term "should." We agree with appellant that Canon 3 is couched in language intended to reflect the aspirational character of the code until adopted by a particular jurisdiction. We therefore construe Canon 3(C)(1) to require disqualification whenever, objectively, the judge's participation in a case creates the appearances of impropriety.

5. Indeed, we entirely agree with the concern eloquently expressed in the dissent for the utmost sensitivity of judges to the need for impartiality, in appearance as well as actuality. It cannot be gainsaid that any judge contemplating leaving the bench for other employment must give most careful consideration to recusal potentiality under Canon 3(C)(1) as the process continues. *See, e.g., Pepsico Inc. v. McMillen,* 764 F.2d 458 (7th Cir.1985) (court finds reasonable appearance of conflict when judge's agent contacts parties' law firm concerning judge's future employment). Also, as we mentioned earlier, the issue of recusal in this case was raised for the first time after appellant's conviction and sentencing. In this context, a review for prejudice is necessary. Our analysis would be different if we were considering a decision of the trial judge on a pretrial motion to recuse.

*See* D.C.App.R. 21 (writ of mandamus and prohibition).

6. As the Supreme Court has recently reminded, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 1584, 89 L.Ed.2d 823 (1986) (quoting *FTC v. Cement Institute,* 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948)). "Not '[a]ll questions of judicial qualification ... involve constitutional validity. Thus, matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.'" *Aetna Life Ins. Co. v. Lavoie, supra,* 106 S.Ct. at 1584 (quoting *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)). The general prohibition of Canon 3(C)(1) covers a wide sweep of situations where a judge's impartiality might be questioned, ranging from the arguable to direct personal bias or prejudice, or financial interests, or familial relationships to the parties litigant. As already mentioned, in the more stark situations, recusal is mandatory. In others, as here, disclosure and consent is an option. Canon 3(D). The government argues there was no canon violation at all. Of course, it should go without saying that Judge Murphy's sterling reputation is not at issue here. *See generally Laird v. Tatum,* 409 U.S. 824, 829, 93 S.Ct. 7, 10, 34 L.Ed.2d 50 (1972) (memorandum of Rehnquist, J.) (in the area of recusal, the Justice Department's problem "is special because it is the largest law office in the world and has cases by the hundreds of thousands and lawyers by the thousands").

ties. But to perform its function in the best way "justice must satisfy the appearance of justice."

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). *See Aetna Life Insurance Co. v. Lavoie, supra,* 106 S.Ct. at 1587 (quoting *Murchison* ). Nonetheless, even certain errors of constitutional magnitude will not require reversal if harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *see Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3105–07, 92 L.Ed.2d 460 (1986).

Appellant submits that an inquiry into the harmfulness or prejudice of Judge Murphy's participation in his trial and sentencing is inappropriate in light of *Murchison, supra,* and other cases which have spoken of the due process implications of the appearance of impropriety alone. *E.g., Lavoie, supra.* We know from such authority, however, that the appearance of injustice will not always, but only "sometimes" violate due process in the absence of actual prejudice. And we do not view this particular case to be on that plane.

In *Rose v. Clark, supra,* the Supreme Court recently considered the harmless-constitutional-error standard of *Chapman v. California, supra,* in the context of a jury instruction which had impermissibly shifted the burden of proof as to malice to the defendant. In holding that such constitutional error was subject to the prejudice analysis of *Chapman,* the Court in *Clark* distinguished those instances in which constitutional error had been held to require reversal without regard to the evidence in the particular case. 106 S.Ct. at 3106. Of interest here is the Court's treatment of constitutional error in the nature of a biased adjudicator. Citing *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the Court recognized that trial by a partial judge is one type of error which "necessarily render[s] a trial fundamentally unfair." *Rose, supra,* 106 S.Ct. at 3106. Then assimilating the import of one's due process right to an impartial judge with the right to counsel, *Gideon v. Wainwright,*

372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Court observed:

Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, *see Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and no criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436 [89 L.Ed.2d 674] (1986) (constitutional error may be harmless "in terms of their effect on *the factfinding process at trial* ") (emphasis added); *Chapman, supra,* 386 U.S. at 24, [87 S.Ct. at 828] (error is harmless if, beyond a reasonable doubt, it "did not *contribute to the verdict* obtained") (emphasis added).

*Clark, supra,* 106 S.Ct. at 3106 (footnote omitted). *See Gray v. Mississippi,* —— U.S. ——, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (improper excusal of juror for cause in capital case cannot be harmless); *id.* at 2056 (plurality states that denial of constitutional right to an impartial jury is not subject to harmless-error analysis).

In view of appellant's concession that there is no basis for concluding Judge Murphy was actually biased, this case is unlike that of the biased adjudicator referred to in *Clark* who renders a trial fundamentally unfair regardless of prejudice to the defendant. *Tumey v. Ohio, supra,* which was cited with approval in *Clark,* involved the Mayor of a village who was paid for his services as a judge only if he convicted those who were brought before him. 273 U.S. at 520, 47 S.Ct. at 440. In holding that Tumey had been tried without due process, the Supreme Court deemed dispositive the fact that the Mayor had a "direct, personal, substantial, [and] pecuniary interest in reaching a conclusion against him in his case." *Id.* at 523, 47 S.Ct. at 441. This "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defend-

ant, or ... might lead him not to hold the balance nice, clear and true between the state and the accused." *Id.* at 532, 47 S.Ct. at 444. And it was on the basis of the adjudicator's "direct, personal, substantial, [and] pecuniary" interest in the outcome— an interest which is conspicuously absent here—that the Court rejected the state's contention that Tumey's conviction should nevertheless stand on the strength of the evidence of guilt. *Id.* at 535, 47 S.Ct. at 445; *see Pope v. Illinois,* — U.S. —, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987) (citing *Clark* and stating that harmless-error review is appropriate absent "error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge"); *Van Arsdall, supra,* 106 S.Ct. at 1437 (citing *Tumey* and stating that reversal is required without regard to prejudice where the trier of fact has financial stake in the outcome). The same can be said of more recent cases in which the Court has found a judge's participation to violate due process irrespective of actual prejudice. *See, e.g., Lavoie, supra,* 106 S.Ct. at 1586–87 (regardless of actual influence, due process denied where appellate judge's opinion for the court had the clear and immediate effect of enhancing both the legal status and settlement value of his own pending litigation); *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 31 L.Ed.2d 267 (1972) (special prejudice need not be shown where violation of due process established by Mayor's adjudication of case, the fine from which went to municipality's funds).

Hence, the appearance of possible partiality, without more, does not always render a trial fundamentally unfair so as to violate perforce the process due the criminal defendant.[7] As with other types of error which do not require reversal *per se,* assumed error of the kind revealed here— this violation of Canon 3(C)(1)—we hold to be subject to review for prejudice. We find particularly informative on this point the Supreme Court's treatment with harmless-error analysis of errors amounting to due process deprivations. *E.g., Clark, supra,* 106 S.Ct. at 3109 (remanding for harmless-error review on instructional error which violated due process). *Cf. Hopper v. Evans,* 456 U.S. 605, 613–14, 102 S.Ct. 2049, 2053–54, 72 L.Ed.2d 367 (1982) (jury instruction did not prejudice defendant). Also informative are the instances in which other serious constitutional errors have been deemed subject to harmless-error scrutiny. *E.g., Van Arsdall, supra,* 106 S.Ct. at 1436–38 (sixth amendment right of confrontation); *United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (fifth amendment right against compelled self-incrimination); *Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 467, 54 L.Ed.2d 424 (1977) (sixth amendment right to counsel); *Chambers v. Maroney,* 399 U.S. 42, 52–53, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970) (admission of evidence obtained in violation of fourth amendment). *Cf. also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (review for prejudice of ineffective assistance of counsel).[8]

**7.** *See generally Butler v. United States,* 414 A.2d 844, 852–53 (D.C.1980) (en banc) (substantial prejudice resulted from destruction of appearance of impartiality).

**8.** The dissent places considerable reliance on *Young v. United States ex rel. Vuitton Et Fils S.A.,* — U.S. —, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), in which the Supreme Court reversed criminal contempt convictions on the ground that the specially appointed prosecuting attorneys were also counsel for a party that was the beneficiary of a district court order, the violation of which resulted in the contempt prosecutions. *Young* is inapposite because it falls within the category of cases we have distinguished in this opinion involving adjudicators who were directly interested in the litigation.

Thus, the dissent incorrectly relies on language in *Young* pertaining to the appearance of impropriety in isolation of its factual context—the private prosecutors appointed for the contempt proceedings also represented an interested party in the underlying civil litigation. Moreover, *Young* was decided pursuant to the Court's supervisory authority, and did not purport to resolve constitutional issues. Finally, the dissent's reliance on the statement of four Justices in *Young* respecting the inapplicability of harmless-error analysis is also misplaced. The Justices' pronouncement on this issue must be read in the limited context of the facts presented. Indeed, the Justices cited important cases such as *Ward v. Village of Monroeville* and *Tumey v. Ohio, supra,* which are analogous to *Young,* but

■ In the setting of a criminal trial, the prejudice presumed to be attendant to a possible lack of impartiality on the part of the presiding judge would arise in those instances where the judge has assumed a factfinding role. *Cf. Clark, supra,* 106 S.Ct. at 3106 (quoting parenthetically *Van Arsdall* and *Chapman, supra*). Of course, if a judge conducted himself in a manner which might reasonably be perceived as having been motivated by actual bias either in favor of the government or against the accused, due process of law would fail. *Cf. Murchison, supra,* 349 U.S. at 138, 75 S.Ct. at 626 ("the judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression").

■ We view the appropriate inquiry for prejudice to involve the examination of the trial proceedings from this perspective. Therefore, to establish a colorable claim of prejudice in a case of this nature, the person convicted must show either that he was tried by a judge, rather than a jury, or if tried by a jury, that one of the following took place: the presiding trial judge denied a motion to suppress evidence or other pretrial motion on which the conviction stands on the basis of credibility findings adverse to him; the judge made critical rulings against him during trial in the posture of a factfinder; or the judge otherwise conducted the trial in a manner which, though falling in the broad reach of trial court discretion, might reasonably be perceived as having been motivated by actual bias. Of course, nearly every trial is unique in some form. Thus, we do not foreclose the possibility of reversal on some other ground demonstrating a colorable claim of prejudice.

■ Having reviewed the trial proceedings of this case, we find no basis upon which appellant might establish a colorable

claim of prejudice as a result of questioned appearance of impartiality from Judge Murphy's participation. On the issue of prejudice, the most ameliorating feature of the trial is that a jury, not the judge, served as the factfinder and, ultimately, the adjudicator of guilt and innocence. *See Butler, supra* note 7, 414 A.2d at 852. It was the jury, not the judge, which convicted appellant of assault with intent to kill while armed and acquitted him of obstruction of justice. Significantly, the only instance in which Judge Murphy actually passed judgment on an indicted charge occurred after the government's case-in-chief when he directed an acquittal for appellant on the count of assault with a deadly weapon.

The record does reflect, however, that following a pretrial evidentiary hearing Judge Murphy denied appellant's motion to suppress identification evidence.[9] The transcript of this hearing was not designated as part of the record on appeal. We have ordered the record supplemented with the transcript and find nothing therein suggesting the need for a new trial.

The identification evidence referred to was derived in part from a photograph array presented to a witness to the incident which led to appellant's indictment for assault with a deadly weapon and obstruction of justice. However, as mentioned, appellant was acquitted by the court of this assault charge and by the jury of obstruction of justice. Also sought to be suppressed was evidence which derived from a single photograph identification of appellant by Herbert Hayes, the victim of the earlier incident resulting in the conviction now challenged. The transcript of that suppression hearing reveals that the facts pertaining to Hayes' identification were not in dispute. The witness had known appellant in the neighborhood for eleven years. Thus, it is clear that Judge Murphy's role with respect to this issue was limited to an

not to this case, as they involve financially interested adjudicators.

**9.** Appellant had filed a separate motion to suppress oral statements he made to the police in

October 1984. It appears that this motion was withdrawn when the government agreed not to use the statements in its case-in-chief.

application of law to the undisputed facts. In any event, appellant's defense at trial was grounded on a theory of justification rather than misidentification.

The trial itself reveals no instance in which Judge Murphy assumed the posture of factfinder or demonstrated prejudice either in favor of the government or against the accused. The judge's role was limited to rulings which involved the straightforward application of law. In this respect the judge entertained, for example, a request to compel discovery, evidentiary questions, and proposals for jury instructions. And his rulings on these and other matters amounted to legal rulings apart from credibility.[10] Indeed, on at least two occasions Judge Murphy ensured that rulings of law adverse to appellant, but which defense counsel had not objected to, were properly preserved for appeal. We conclude, therefore, that the questioned appearance of impartiality here was harmless "in terms of [its] effect on *the factfinding process at trial.*" *Van Arsdall, supra,* 106 S.Ct. at 1436 (emphasis added).[11]

█ We have no reason to believe that appellant's sentencing hearing was conducted any differently or that the sentence imposed reflected bias on the part of Judge Murphy. Appellant has failed to designate as part of the record pertinent transcripts. Nevertheless, since sentencing is such a personal judgment for the judge imposing it, we think it just under the circumstances to remand for resentencing. *See* D.C.Code § 17–306 (1981); *see generally McPhaul v. United States,* 452 A.2d 371, 374 (D.C.

1982). We do so because in the sentencing phase of appellant's case the judge was afforded particularly broad discretion. *See, e.g., Butler v. United States,* 379 A.2d 948, 950 (D.C.1977).

## II.

Appellant's other contentions warrant less discussion. He maintains that the trial court committed reversible error when it refused to instruct the jury on his claim of self-defense and that he was denied a fair trial as a result of prosecutorial misconduct during closing arguments. We disagree.

As the government points out, the theory of self-defense explained to the jury during opening statements was that the victim, Herbert Hayes, pulled a knife on appellant in escalation of their fist fight and that Hayes was then stabbed when the two struggled for possession of the knife. This defense proved unavailing, however, when counsel could not get Hayes to admit on cross-examination that he was in possession of a knife that night or that he had pulled one on appellant, and when the eyewitness to the fight refuted the defense version. The inadequacy of proof to support the defense theory was magnified when appellant chose not to present any evidence consistent with self-defense.

At the conclusion of the trial, counsel raised a different predicate for an instruction on self-defense, arguing that the instruction would be appropriate in light of evidence that Hayes had struck the "first blow" in the fight. When the court replied that defense by "deadly" force would not

---

**10.** As noted earlier, appellant challenges on this appeal the judge's ruling on his request for a self-defense instruction and instances of prosecutorial misconduct. With regard to the claimed instructional error, we hold *infra* that Judge Murphy was correct as a matter of law. As to prosecutorial misconduct, we hold *infra* that there was no misconduct which rose to the level of plain error. Thus, appellant was not prejudiced in any manner by the judge's role on these issues.

**11.** The dissenter's legitimate concern for the appearance of impartiality does not escape the majority. The concern expressed in the dissent, however, focuses only on selected facts—the trial judge's potential employment at the Depart-

ment of Justice while presiding at a criminal trial brought by the United States. In that limited context, it is not surprising that one would conclude the "average citizen"—whether the criminal defendant, who is hardly "average," or a person who is not a defendant—would think there is an appearance of partiality. But the real question is, considering all the facts, including the actual role the trial judge played in the case, would the average person perceive a possible injustice. We think it more likely that person would perceive an unjustified reversal on a "technicality." This is exactly why the court looks to the precise role the trial judge played—that is, a critical examination of the record for prejudice.

have been justified in that event, counsel agreed but then asserted that appellant's use of deadly force had not been established. The court immediately disagreed with counsel, pointing to the evidence that appellant had used a knife against Hayes. Apparently conceding this point, counsel then returned to his earlier argument centered on Hayes' provocation. And when pressed by the court to recount evidence justifying the use of deadly force in defense, counsel stated that Hayes' provocation was enough given that the altercation occurred late at night and on the street, as well as the evidence indicating that Hayes was intoxicated. The court rejected this position and refused the requested instruction.

■■■ Appellant's use of deadly force was unequivocally proven by evidence that he thrust a knife into Hayes' midsection. "[W]here an accused, claiming self-defense, uses deadly force, he must—at the time of the incident—actually believe and reasonably believe that he is in imminent peril of death or serious bodily harm." *McPhaul, supra,* 452 A.2d at 373 (citing *United States v. Peterson,* 157 U.S.App.D.C. 219, 483 F.2d 1222, *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973)). *See* Criminal Jury Instructions for the District of Columbia, No. 5.14 (3d ed. 1978). The evidence adduced at trial established that appellant escalated to a deadly level an otherwise weaponless street scuffle. There was no evidence that he actually believed he was in imminent peril of death or serious injury from the fist fight, and such an inference cannot be drawn from the circumstances. Nor would that belief, if actually held, be reasonable. Thus, in our view, the trial court did not err in declining to instruct the jury on self-defense.

■■■ With regard to prosecutorial misconduct, appellant maintains that he was denied a fair trial because the prosecutor, during closing argument, referred to facts not in evidence, "appealed to the jury's fears of personal violence," and commented on his decision not to testify. While we have serious misgivings about one such misstatement of evidence by the prosecutor, appellant never objected to the misstatement at trial and, in our view, it was not so grave as to constitute plain error. *See Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (en banc).[12]

■■■ The offending statement was made when the prosecutor was recounting the evidence pertaining to the fist fight be-

12. We relegate to this footnote all but one of the asserted instances of misconduct. As to the claimed misstatements of evidence, appellant points to the prosecutor's references that there had been a "fair fight" until he became "dissatisfied" when Hayes started "getting the better" of him. But the prosecutor qualified her reference to a fair fight with the phrase "just with fists." Moreover, these statements amounted to reasonable inferences from the evidence, which the prosecutor could properly argue. *See, e.g., Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984). Appellant also objects to the prosecutor's statement that the knife he used against Hayes was "four or five inches long." The knife was not introduced into evidence, and the record reveals no testimony concerning its length. However, the reference to its size would bear only, if at all, on the issue of whether appellant acted with an intent to kill. Given the graphic testimony from Hayes' emergency physician about his extensive, life-threatening injuries, the jury would surely have inferred that the knife was of sufficient length to kill. In any event, the prosecutor's reference to the size of the knife does not rise to the level of plain error.

Appellant also contends that the prosecutor improperly appealed to the jury's fears of personal violence by characterizing the stabbing as "brutal," by describing the knife as a "vicious instrument of death," and by suggesting that Hayes might have died had he not received immediate medical attention. These references (the first two were objected to at trial) were not improper at all and were reasonably inferable from the evidence. *Williams v. United States,* 478 A.2d 1101 (D.C.1984), and *Powell v. United States,* 455 A.2d 405 (D.C.1982), upon which appellant relies, are clearly distinguishable. In those cases, the prosecutor played on the possibilities of death to innocent people had the armed robbers involved actually used the weapons they only threatened to use.

Appellant argues further that prejudicial misconduct occurred when the prosecutor commented on appellant's failure to take the stand. We disagree that the comments referred to were manifestly intended, or were of such nature that the jury would naturally and necessarily take them as a statement on appellant's failure to testify. *See Boyd v. United States,* 473 A.2d 828, 833 (D.C.1984). In any event, there certainly was no plain error.

tween appellant and Hayes, before it had culminated in the stabbing. After describing how appellant became dissatisfied that Hayes was winning the fight, the prosecutor related appellant's response, which was to say to Hayes "I'll teach you." This declaration appears nowhere in the record. The prosecutor then narrated the stabbing itself, graphically highlighting its details.

One implication of such a statement by appellant is that he acted with the requisite intent to kill underlying the offense with which he was charged. By placing these words in appellant's mouth the prosecutor created, albeit inadvertently it seems, verbal evidence of his intent to "teach" Hayes where none in fact existed. While the chosen words probably were meant to suggest an inference, as the government argues, we conclude that the language cited falls short of a reasonable inference from the evidence actually adduced at trial. *See Jones v. United States*, 512 A.2d 253, 257–58 (D.C.1986) (quoting *Streater, supra* note 12, 478 A.2d at 1058–59).

■ To determine whether this argument amounted to plain error as defined in *Watts v. United States, supra*, 362 A.2d at 709, "viewing the comments in context, we must consider [its] gravity ... [its] direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985) (citations omitted; quoted in *Jones, supra*, 512 A.2d at 258). Under this analysis, we conclude that the misstatement of concern here was not plain error. Of particular significance to our holding is the evidence which truly bore on appellant's intent. See note 12, *supra*. We agree with the government that "[a]lthough the comment did reflect on appellant's guilt or innocence, it at most imputed to appellant a verbal acknowledgement of intent that was already shown graphically by his actions."

In *Jones v. United States, supra*, where we found plain error from similar misconduct, but not here, the activity of the accused which was verbalized by the prosecutor was "consistent with innocence as well as with guilt." 512 A.2d at 258. In addition, the prosecutor in *Jones* repeatedly asserted the fact not in evidence, and thereby strengthened the government's case considerably. *Id.* Here, by contrast, the prosecutor's comment was made only once, and in summarizing the evidence supporting the intent to kill, she did not claim the statement supported the government's case. Rather, she stressed to the jury that instead of merely threatening or nicking Mr. Hayes with the knife, appellant stabbed him in a vital area of the body. For these reasons our decision in *Jones* is distinguishable.

Appellant's conviction is affirmed, as is the order denying relief under § 23–110, *supra*. We remand for resentencing as stated above.

*So ordered.*

ROGERS, Associate Judge, dissenting.

This appeal presents a question of first impression: what "the average citizen"[1] who is facing prosecution by the United States Department of Justice would think about the appearance of partiality if he knew the judge to preside at his trial was negotiating future employment with that department. So stated, I think the answer is clear notwithstanding the trial judge's good reputation[2] and the absence of actual prejudice. Accordingly, I would hold that the trial judge was required either to recuse himself from Scott's case or to inform the parties he was actively pursuing employment with the Justice Department and obtain their consent to his participation in the case, and because this did not happen, Scott is entitled to a new trial "in the interest of justice." SUPER.CT.CRIM.R. 33.

1. *See United States v. Heldt*, 215 U.S. App.D.C. 206, 239, 668 F.2d 1238, 1271 (1981) (discussing federal recusal statute, 28 U.S.C. § 455, mandating Canon 3 (C)(1) standard), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

2. *See ante* at 1045 note 6.

Our criminal justice system is founded on the public's faith in the impartial execution of duties by the important actors in that system. *Young v. United States ex rel. Vuitton et fils S.A.,* —— U.S. ——, 107 S.Ct. 2124, 2139, 2141, 95 L.Ed.2d 740 (1987). It is beyond dispute that the trial judges perform a unique and pervasive role in that system,[3] and that they are expected to adhere to high standards of conduct. *See generally* CODE OF JUDICIAL CONDUCT FOR UNITED STATES JUDGES, approved by the Judicial Conference of the United States (Rev. May, 1987); *In re Evans,* 411 A.2d 984, 996 (D.C.1980) (Code of Judicial Conduct adopted for the District of Columbia Courts); *see also Byrd v. United States,* 377 A.2d 400, 404 (D.C.1977) ("[t]he essence of the judicial role is neutrality").[4]

Canon 3(C)(1) of the Code of Judicial Conduct provides that "A judge *shall* disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably be questioned....*" (Emphasis added).[5] An objective standard is to be applied, *Heldt, supra* note 1, 215 U.S.App. D.C. at 239, 668 F.2d at 1271, in the interest of providing justice in individual cases

and in the interest of maintaining public confidence in the integrity of the judicial process,[6] "which in turn depends on a belief in the impersonality of judicial decision making," *United States v. Nobel,* 696 F.2d 231, 235 (3rd Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); neither bias in fact nor actual impropriety is required to violate the canon. *Hall v. Small Business Administration,* 695 F.2d 175, 178–79 (5th Cir.1983) (federal disqualification statute "focuses on what is revealed to the parties and the public, as opposed to the existence in fact of any bias or prejudice [and] cannot ... extend to ... the judge's actual virtue ...").

The Supreme Court has stated that due process requires that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). The Court has adhered to the "stringent rule" of *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927)[7] even though it "may

---

**3.** *See United States v. Quattrone,* 149 F.Supp. 240, 242 (D.D.C.1957) (Youngdahl, J.) ("confidence in the Judiciary is essential to the successful functioning of our democratic form of government"). As stated by Mr. Justice Frankfurter:

> Criminal justice is concerned with the pathology of the body politic. In administering the criminal law, judges wield the most awesome surgical instruments of society. A criminal trial, it has well been said, should have the atmosphere of the operating room. The presiding judge determines the atmosphere. He is not an umpire who enforces the rules of the game, or merely a moderator between contestants. If he is adequate to his functions, the moral authority which he radiates will inspire the indispensable standards of dignity and austerity upon those who participate in a criminal trial.

*Sacher v. United States,* 343 U.S. 1, 37–38, 72 S.Ct. 451, 468–69, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting).

**4.** *See also O'Donoghue v. United States,* 289 U.S. 516, 531–32, 53 S.Ct. 740, 743–44, 77 L.Ed. 1356 (1933) (quoting THE FEDERALIST No. 78 (A. Hamilton) ("The complete independence of the courts of justice is peculiarly essential in a limited Constitution.") and Chief Justice John Marshall's remarks during the debates of the Virginia State Convention of 1829–1830 (It is "to the

last degree important, that he [the judge] should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience[]...."))*.

**5.** The Canon provides that its statement of the instances in which recusal is required is not all inclusive. In one Justice's view, recusal is required

> [w]hen there is ground for believing that such unconscious feelings may operate in the ultimate judgment, or may not unfairly lead others to believe they are operating, judges recuse themselves. They do not sit in judgment. They do this for a variety of reasons. The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact. (Emphasis added).

*Public Utilities Comm'n of the District of Columbia v. Pollak,* 343 U.S. 451, 466–67, 72 S.Ct. 813, 822–23, 96 L.Ed. 1068 (1952) (Frankfurter, J., concurring).

**6.** *See generally* Note, *Disqualification of Judges and Justices in the Federal Courts,* 86 HARV.L.REV. 736, 746 (1973).

**7.** In *Tumey v. Ohio,* the Court said:

> the requirement of due process of law in judicial procedure is not satisfied by the argu-

sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scale of justice equally between contending parties[ ]" precisely because "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra,* 349 U.S. at 136, 75 S.Ct. at 625. The Court also has long recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed. 2d 705 (1967); *see Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3106 & n. 6, 92 L.Ed. 2d 460 (1986) (biased adjudicator never harmless error) (citing *Tumey v. Ohio, supra,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 741)). Most recently in *Vuitton, supra,* 107 S.Ct. 2124, the court reversed a conviction where counsel for an interested party had been appointed contempt prosecutor. Four justices rejected the view that harmless error analysis is "equal to the task of assuring [essential public] confidence [in the 'disinterested conduct' of the prosecutor]." *Id.* at 2141. Although "the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers," *id.* at 2139, the justices concluded that harmless error analysis is nevertheless inappropriate because "[a] concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system." *Id.* at 2140. A majority of the court emphasized the fundamental and pervasive effects of the error on the contempt prosecution, the fifth justice viewing the defect even more fundamental than the plurality because the appointments were not an exercise of judicial power under Article III §§ 1, 2, and hence were void. 107 S.Ct. at 2141–42 (Scalia, J., concurring).

The majority here distinguishes between the cases dealing with the issue of appearances and the "reasonable grounds to question impartiality" of Canon 3(C) as a basis for concluding that Scott must demonstrate a potential for harmfulness. A prejudice test cannot apply where the appearance of partiality taints the entire proceeding. *See Vuitton, supra,* 107 S.Ct. at 2139–41.[8] As the Supreme Court has recently stated, harmless error analysis "is best suited for the review of discrete exercises of judgment by lower courts, where information is available that makes it possible to gauge the effect of a decision on the trial as a whole." *Id.* at 2141. It "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Rose v. Clark, supra,* 106 S.Ct. at 3106 (footnote omitted). It is simply inadequate to accomplish what this court repeatedly has affirmed is vital to the criminal justice system. For example, in *In re Campbell,* 522 A.2d 892, 895 (D.C.1987),[9] the court embraced, as "correctly captur[ing] society's expectations for members of the judiciary," a statement by the District of Columbia Board of Professional Responsibility which read in part:

> [W]hen one contemplates the essence of judicial office, society commits enormous power into the hands of judges, particularly trial judges, because of an abiding faith that those judges will act impartially and without fear or favor. * * * Society grants judges such enormous power exactly because of its confidence that judges will act fairly and impartially. * * * In other words, the appearance of justice is as important as the fact of justice where those who sit in judgment are concerned. It is precisely because of our strongly held beliefs about the ap-

---

ment that men of the highest honor and the greatest self-sacrifice could carry on without danger of injustice. Every procedure which would offer a possible temptation to the average man as judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law. 273 U.S. at 532, 47 S.Ct. at 444.

**8.** *See also Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986) (quoting *In re Murchison, supra,* 349 U.S. at 136, 75 S.Ct. at 625) (state supreme court justice).

**9.** The case involved the disbarment of a trial judge upon conviction of a crime involving moral turpitude—receipt of an illegal gratuity on or because of an official act (18 U.S.C. § 201(g)).

pearance and the fact of impartiality that judges are subject to the excruciatingly high ethical standards that we impose on them. * * * Put another way, society must protect the integrity of the judicial system so that people will submit their disputes to that system and abide by its judgments, at least in part, of their own free will.[10]

522 A.2d at 896.

The timing of Scott's objection can offer no basis for a prejudice test by this court. *See ante* at 1045 note 5. Scott and his counsel did not learn about the trial judge's employment negotiations with the Justice Department until after his trial was over and he had been sentenced, and hence had no opportunity to raise a pretrial or midtrial objection.[11] The motions judge declined to rule on the merits of Scott's claim that the trial judge's failure to disclose his employment negotiations had violated Canon 3(C) and he had been denied due process of law, viewing the issue as more properly raised on direct appeal rather than in the trial court as a collateral attack. It is

entirely fitting for this court, in the exercise of its supervisory powers,[12] to make clear the procedure which must be followed by a trial judge who is engaged in negotiations about future employment with the Justice Department, a party to the case. That we find neither precedent nor Canon illustration directly on point should not cause us to demur.

Requiring a trial judge, in the absence of recusal, to disclose to the parties the fact of on-going negotiations for future employment with the Justice Department and to obtain their consent to the judge's participation in the criminal proceedings[13] need not unduly inconvenience the Superior Court.[14] The societal cost of a new trial is a small price to pay in order to ensure that Scott and the general public continue to have faith in the judiciary's impartiality. Indeed the history of the common law judge in the United States convinces me that the success of our system of justice hinges on the public perception and confidence that judges are neutral and impartial participants in the cases they hear.[15] Al-

---

**10.** *Cf. Sloan v. United States,* 527 A.2d 1277, 1287 (D.C.1987) (recusal may be necessary where judge receives ex parte information that renders the judge unable to function as impartial adjudicator, although in some cases disclosure to counsel may satisfactorily address the problem); *cf. also Banks v. United States,* 516 A.2d 524, 528–29 (D.C.1986) (judicial disqualification upon exposure to information during aborted plea proceeding), *cert. denied,* — U.S. ——, 108 S.Ct. 485, 98 L.Ed.2d 483; *In re C.S. McP.,* 514 A.2d 446, 452 (D.C.1986) (new judge required for resentencing after prosecutor violated plea agreement); *White v. United States,* 425 A.2d 616, 620 (D.C.1980) (resentencing before another judge where judge, although faultless, was exposed to information disclosed in violation of plea agreement); *Butler v. United States,* 414 A.2d 844 (D.C.1980) (en banc) ("destruction of the appearance of impartiality" in violation of due process required recusal where trial judge, sitting as trier of fact, learns from defense counsel the merits of defendant's case and that defendant plans to commit perjury).

**11.** After learning about the judge's negotiations, Scott filed a motion under D.C.Code § 23–110 (1981) to vacate the judgment of conviction and for a new trial, or, in the alternative, for resentencing before a new judge.

**12.** *See Oliver v. United States,* 384 A.2d 642 (D.C.1978); *see also Aetna Life Insurance Co. v. Lavoie, supra* note 8, 106 S.Ct. at 1589 ("Con-

gress and the States, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated [by due process] here today.")

**13.** Canon 3(D), Remittal of Disqualification, provides that, except in circumstances set forth in (a) through (d) of Canon 3(C)(1), a judge may, instead of withdrawing from the proceeding because his impartiality might reasonably be questioned, disclose on the record the basis of the disqualification, and if the parties and lawyers, "independently of the judge's participation," agree in writing to waive the judge's disqualification, the judge may preside in the proceeding. See Interim Advisory Comm. on Judicial Activities, Advisory Op. 25 (1972), on the procedure for assuring the voluntary nature of the consent.

**14.** The Superior Court of the District of Columbia has over fifty trial judges who, from time to time, receive rotating assignments from the chief judge to one of five divisions of the court.

**15.** I am indebted to the stimulating and informative course taught by Calvin Woodard, Doherty Professor of Law, University of Virginia, as part of the Master of Laws in the Judicial Process program at the University.

though the trial judge's reputation and Scott's disavowal of any claim of actual bias cause me to reach with some reluctance the conclusion that Scott is entitled to a new trial, as Judge Posner wrote for the Seventh Circuit in fairly similar circumstances, "[t]he dignity and independence of the judiciary are diminished when the judge comes before the lawyers in the case in the role of a suppliant for employment. The public cannot be confident that a case tried under such conditions will be decided in accordance with the highest traditions of the judiciary." *Pepsico v. McMillen, supra,* 764 F.2d 458, 461 (7th Cir.1985).[16]

The suspicion of harm in Scott's case is, in any event, ever present. Despite the fact that Scott's trial was before a jury, the trial judge, inevitably, was a major participant in the conduct of the proceedings. Scott not only made a motion to suppress evidence which required the judge to find facts, but, as is apparent from the very issues which Scott has raised in his direct appeal, the trial judge made a number of critical rulings in which the importance of a defendant's faith in the judge's impartiality assumes heightened significance: these rulings include the denial of Scott's motion for an instruction on self-defense and his objections to prosecutorial misconduct during closing arguments. Notably, the latter issue gives the majority some pause in that it finds the prosecutor probably meant to supply the inference of which Scott complains and holds prosecutorial misconduct did occur at the trial.[17] Thus, even under the majority's test, that Scott must show that "the judge made critical rulings against him during trial in the posture of a factfinder," *ante* at 1048, Scott has met his burden and thereby demonstrated "a potential for prejudice."

From the beginning to the end of Scott's trial, the trial judge's active negotiations for employment with the prosecutor's employer presented the specter of partiality which the Judicial Canons and the Supreme Court entreat all judges scrupulously to avoid. The employment sought by the trial judge involved "oversight responsibility and policy guidance to the Debt Collection Units in the United States Attorney's offices," [18] and, consequently, a fully informed defendant might reasonably question whether the judge "could decide the case with the requisite aloofness and disinterest when he had just solicited ... employment by the [agency] in the case." *Pepsico Inc. v. McMillen,* 764 F.2d 458, 461 (7th Cir.1985). The situation does not change because of the trial judge's general reputation among his colleagues and the legal community. *See id.* Nor does it change because the prospective employer is the Department of Justice; the negotiations at issue are ethically indistinguishable from negotiations for employment with a large private law firm. The standards for judges are "stringent," and, under the circumstances, this court should view the potential for prejudice "intolerable." *Vuitton, supra,* 107 S.Ct. at 2137 n. 18.

---

**16.** In *Pepsico v. McMillen, supra,* the Seventh Circuit granted a petition for mandamus notwithstanding the absence of any actual impropriety were the judge to preside at trial. The court concluded that recusal was required because a "headhunter" acting on the trial judge's behalf had contacted the law firms of the parties to the litigation. The judge was "of unblemished honor and sterling character," but the court was satisfied that the parties "would entertain a significant doubt that justice would be done in the case," and "wonder whether Judge McMillen might not at some unconscious level favor the firm ... that had not as definitively rejected him." 764 F.2d at 460, 461. The Seventh Circuit acknowledged its conclusion was a reluctant but necessary one notwithstanding the fact that the firms had declined to consider the judge for future employment and there was no indication that the judge was disappointed, since he had set several conditions for his future employment.

**17.** *See ante* at 1050–1051. This was a one-witness case where Scott's defense was justification. In his brief in this court Scott argues that the government's case was hardly overwhelming and the prosecutor compensated in closing argument for the thinness of the evidence of specific intent to kill by putting words in Scott's mouth ("I'll teach you") which, as the majority opinion states, *ante* at 1051, were nowhere in the record. *See Jones v. United States,* 512 A.2d 253, 258 (D.C.1986) (plain error found where prosecutor argued fact not in evidence which "significantly strengthened the inference" of guilt).

**18.** *See* affidavit filed by the trial judge at 2.

**1056**

Accordingly, I respectfully dissent, and do not reach the issues discussed in Part II of the majority opinion.